747 S.E.2d 757

Thelma M. POCH, as Personal Representative for
the Estate of Kenneth O. Poch, Petitioner,

v.

BAYSHORE CONCRETE PRODUCTS/SOUTH CAROLINA,
INC., Bayshore Concrete Products Corporation, Tidewater
Skanska Group, Inc., and Tidewater Skanska, Inc., Defendants,

of whom Bayshore Concrete Products/South Carolina, Inc., and
Bayshore Concrete Products Corporation, are Respondents.

Kevin Key and Sandra Key, Petitioners,

v.

Bayshore Concrete Products/South Carolina, Inc., Bayshore
Concrete Products Corporation, Tidewater Skanska Group,
Inc., and Tidewater Skanska, Inc., Defendants,

of whom Bayshore Concrete Products/South Carolina, Inc., and
Bayshore Concrete Products Corporation, are Respondents.

Thelma M. Poch, as Personal Representative for the Estate
of Kenneth O. Poch and Julius Poch, Petitioner,

v.

Bayshore Concrete Products/South Carolina, Inc., Bayshore
Concrete Products Corporation, Tidewater Skanska Group,
Inc., and Tidewater Skanska, Inc., Defendants,

of whom Bayshore Concrete Products/South Carolina, Inc., and
Bayshore Concrete Products Corporation, are Respondents.

Appellate Case No. 2010–149288.

No. 27304.

Supreme Court of South Carolina.

Heard Jan. 23, 2013.

Decided Aug. 28, 2013.

Rehearing Denied Oct. 2, 2013.

362

John R. Kuhn, of Kuhn & Kuhn, LLC of Charleston, Robert Bratton Varnado, of Brown & Varnado, LLC of Mt. Pleasant, Christine Companion Varnado and Jason Scott Luck, both of The Seibels Law Firm, P.A. of Charleston, for Petitioners.

Barrett Ray Brewer of Clawson & Staubes, LLC of Charleston, for Respondents.

Justice BEATTY.

Kenneth Poch ("Poch") and Kevin Key ("Key") were temporary workers contracted through Personnel Resources of Georgia, Inc. ("Personnel Resources") and Carolina Staffing, Inc. d/b/a Job Place of Conway ("Job Place"), to work for Bayshore Concrete Products/South Carolina, Inc. ("Bayshore SC") to clean up a concrete casting worksite and dismantle equipment used to produce concrete forms. As a result of a tragic, work-related accident, Poch was killed and Key was injured. Poch's estate and Key received workers' compensation benefits through Job Place.

Subsequently, Key and his wife and the estate of Poch ("Petitioners") filed suit against Bayshore SC and its parent company, Bayshore Concrete Products Corporation ("Bayshore Corp.").[1] The circuit court granted Respondents' motion to dismiss the actions on the ground that workers' compensation was Petitioners' exclusive remedy and, therefore, Respondents were immune from liability in a tort action. The Court of Appeals affirmed the circuit court's order. *Poch v. Bay-*

---

1. Tidewater Skanska Group, Inc., and Tidewater Skanska, Inc., related entities that performed engineering and construction services, were dismissed as defendants.

*shore Concrete Products/South Carolina, Inc.*, 386 S.C. 13, 686 S.E.2d 689 (Ct.App.2009). This Court granted a writ of certiorari to review the decision of the Court of Appeals. Although we agree with the result reached by the Court of Appeals, we find the court incorrectly analyzed Petitioners' arguments. Accordingly, we affirm as modified.

## I. Factual/Procedural History

Bayshore Corp. is a Virginia corporation that is in the business of manufacturing pre-cast concrete products for use in construction projects. On April 21, 2000, the Board of Directors for Bayshore Corp. held a meeting to discuss a bid it secured to supply pre-cast concrete forms for use in the Carolina Bays Parkway project (the "project") in Horry County, South Carolina. On that same day, Bayshore Corp. formed Bayshore SC as its wholly owned subsidiary for the purpose of acting as a remote casting yard to fulfill the bid locally for the project. Bayshore Corp. then executed a lease for the South Carolina factory site and purchased casting equipment from the previous tenant, Traylor Brothers, to be used by Bayshore SC. Bayshore SC paid the rent for the leased property and used the equipment to produce the concrete forms. As a term of the lease, Bayshore SC was required to return the worksite to its original condition.

As the project reached its final stages, Bayshore SC began the cleanup of the worksite by dismantling the equipment and casting beds that were used to create the pre-stressed concrete forms. Because many of the Bayshore SC payroll employees left to seek other employment as the project drew to a close, Bayshore SC sought to hire temporary laborers to assist in the site cleanup and equipment dismantling. Bayshore SC contracted with Job Place to hire workers to help with the project, including Poch and Key.

On June 6, 2002, Poch and Key were directed by Larry Lenart, Bayshore SC's supervisor, to enter a trench dug by Lenart in order to dig around buried steel girders to extract the concrete abutments. When the trench collapsed, Key was injured and Poch was killed. After the accident, Poch's estate and Key received workers' compensation benefits through Job Place.

Subsequently, Petitioners sued Bayshore Corp. and Bayshore SC in tort. In their Answer, Bayshore Corp. and

Bayshore SC claimed Poch and Key were statutory employees of both the parent and the subsidiary. Based on this claim, Bayshore Corp. and Bayshore SC moved for summary judgment or, alternatively, for a dismissal due to the lack of subject matter jurisdiction because workers' compensation was the exclusive remedy for Poch and Key.

After a hearing, during which the parties submitted affidavits [2] and deposition testimony, the circuit court ruled that Bayshore Corp. and Bayshore SC were immune from civil suit as Petitioners' claims fell within the exclusive jurisdiction of the Workers' Compensation Act (the "Act"). In so ruling, the court found: (1) Poch and Key were leased employees who performed the work of Bayshore SC and, in turn, that of Bayshore Corp. at the time of the accident; (2) both corporations were entitled to immunity pursuant to the workers' compensation exclusivity provision because Bayshore SC, the special employer of Poch and Key, was performing the work of Bayshore Corp.; (3) Bayshore SC and Bayshore Corp. were statutory employers of Poch and Key because the employees were performing the work of both corporations; (4) both Bayshore Corp. and Bayshore SC were entitled to workers' compensation exclusivity under the contractor/subcontractor analysis; and (5) both corporations were entitled to tort immunity as they secured workers' compensation coverage for Poch and Key.

Following the denial of their motions for reconsideration, Petitioners appealed the circuit court's order to the Court of Appeals. The Court of Appeals affirmed the decision of the circuit court. *Poch v. Bayshore Concrete Products/South Carolina, Inc.*, 386 S.C. 13, 686 S.E.2d 689 (Ct.App.2009). In finding that Petitioners' exclusive remedy was workers' compensation benefits, the court ruled: (1) Bayshore SC was Poch's and Key's statutory employer; [3] (2) Petitioners failed to

---

**2.** The court denied Petitioners' motions to exclude the affidavits of (1) S. Keith Colonna, the president of Bayshore Corp. and Bayshore SC; (2) Vernon Dunbar, an attorney who attested to the statutory employer status of the corporations; and (3) Larry Lenart, the supervisor at the Bayshore SC site.

**3.** Having found that Bayshore SC was Poch's and Key's statutory employer, the court declined to address any argument regarding the borrowed-employee doctrine. *Id.* at 26, 686 S.E.2d at 696.

present evidence as to any exception or statutory provision that would eliminate Bayshore SC's immunity;[4] (3) Poch and Key were statutory employees of Bayshore Corp. under a contractor/subcontractor analysis and, thus, Bayshore Corp. could invoke the workers' compensation exclusivity provision; and (4) the admission of certain affidavits did not warrant reversal. *Id.* at 23–32, 686 S.E.2d at 694–99.

This Court granted a writ of certiorari to consider whether the Court of Appeals erred in holding that: (1) Bayshore Corp. was entitled to tort immunity as an upstream, statutory employer of Poch and Key; and (2) Bayshore Corp. and Bayshore SC complied with the statutory requirements of securing workers' compensation coverage for Poch and Key. We denied the petition as to Petitioners' challenge regarding the admission of the affidavits.

## II. Discussion

### A. Jurisdictional Implications of Exclusive–Remedy Doctrine

 "The Workers' Compensation Act is the exclusive remedy against an employer for an employee's work-related accident or injury." *Edens v. Bellini,* 359 S.C. 433, 441, 597 S.E.2d 863, 867 (Ct.App.2004). "The exclusivity provision of the Act precludes an employee from maintaining a tort action against an employer where the employee sustains a work-related injury." *Id.* at 441–42, 597 S.E.2d 863. This exclusivity provision states:

The rights and remedies granted by this Title to an employee when he and his employer have accepted the

---

4. *See Cason v. Duke Energy Corp.,* 348 S.C. 544, 547 n. 2, 560 S.E.2d 891, 893 n. 2 (2002) ("The only exceptions to the exclusivity provisions are: (1) where the injury results from the act of a subcontractor who is not the injured person's direct employer; (2) where the injury is not accidental but rather results from the intentional act of the employer or its alter ego; (3) where the tort is slander and the injury is to reputation; or (4) where the Act specifically excludes certain occupations" (citations omitted)). Recently, this Court adopted the "dual persona" doctrine as a narrow exception to the exclusivity provision. *Mendenall v. Anderson Hardwood Floors, L.L.C.,* 401 S.C. 558, 738 S.E.2d 251 (2013). Our decision in *Mendenall,* however, does not affect the disposition of the instant case as the facts do not warrant an application of the "dual persona" doctrine.

provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.

*Provided, however,* this limitation of actions shall not apply to injuries resulting from acts of a subcontractor of the employer or his employees or bar actions by an employee of one subcontractor against another subcontractor or his employees when both subcontractors are hired by a common employer.

S.C.Code Ann. § 42–1–540 (1985). "The exclusivity provision of the Act applies both to 'direct' employees and to those termed 'statutory employees' under § 42–1–400."[5] *Edens,* 359 S.C. at 445, 597 S.E.2d at 869.

 "South Carolina courts have repeatedly held that determination of the employer-employee relationship for workers' compensation purposes is jurisdictional. Consequently, this Court has the power and duty to review the entire record and decide the jurisdictional facts in accord with the preponderance of the evidence." *Glass v. Dow Chem. Co.,* 325 S.C. 198, 201–02, 482 S.E.2d 49, 51 (1997). "Any doubts as to a worker's status should be resolved in favor of including him or her under the Worker's Compensation Act." *Posey v. Proper Mold & Eng'g, Inc.,* 378 S.C. 210, 218–19, 661 S.E.2d 395, 400 (Ct.App.2008).

---

5. Section 42–1–400 provides:

When any person, in this section and §§ 42–1–420 and 42–1–430 referred to as "owner," undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 42–1–420 to 42–1–450 referred to as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him.

S.C.Code Ann. § 42–1–400 (1985).

## B. Status of Bayshore SC

 Petitioners assert the Court of Appeals erred in determining that Bayshore Corp.[6] was entitled to workers' compensation exclusivity as a statutory employer of Poch and Key. In support of this assertion, Petitioners claim that Bayshore Corp. was a "co-subcontractor" with Bayshore SC. Citing section 42–1–540 of the South Carolina Code, Petitioners contend this status negates workers' compensation exclusivity as it does "not apply to injuries resulting from acts of a subcontractor of the employer or his employees." Petitioners explain that "Poch, Key, and Lenart were co-subcontractors hired by a common employer on the Carolina Bays Parkway project." In turn, "Lenart's employer, Bayshore Corp. (VA) is not entitled to immunity" from tort liability.

 "In determining whether an employee is engaged in activity that is 'part of [the owner's] trade, business, or occupation' as required under section 42–1–400, this Court has applied three tests." *Olmstead v. Shakespeare,* 354 S.C. 421, 424, 581 S.E.2d 483, 485 (2003). "The activity is considered 'part of [the owner's] trade, business, or occupation' for purposes of the statute if it (1) is an important part of the owner's business or trade; (2) is a necessary, essential, and integral part of the owner's business; *or* (3) has previously been performed by the owner's employees." *Id.* "If the activity at issue meets even *one* of these three criteria, the injured employee qualifies as the statutory employee of 'the owner.'" *Id.*

We find Bayshore SC qualifies as a statutory employer under one, if not all three, of these tests. First, the work being performed by Poch and Key was an important part of Bayshore SC's business activities as Colonna, the president of both Bayshore SC and Bayshore Corp., testified the collapsed trench was dug in order to dismantle a concrete casting bed by removing concrete abutments from steel piles driven into the ground. He confirmed that dismantling casting beds was performed regularly by Bayshore employees as Bayshore

---

6. Based on our review of Petitioners' briefs, it appears they concede that Bayshore SC was a statutory employer as they primarily challenge Bayshore Corp.'s status. However, for the purposes of analytical progression, we have analyzed Bayshore SC's status.

"couldn't be in the business of precast concrete for long if [it] didn't have the capacity to change [ ] form size and be able to meet customer needs."

Second, Colonna testified that dismantling casting beds was a necessary and integral part of Bayshore's business, which was routinely completed by regular, payroll employees at every Bayshore facility. He also noted that the concrete bed being dismantled by Poch and Key had been constructed by regular Bayshore SC employees. Furthermore, Lenart stated that he dug the trench around the abutments and then instructed Poch and Key to enter the trench and dig around the pile caps and steel beams so that Bayshore SC welders could cut the steel beams.

As to the third test, there is evidence that the dismantling of the concrete forms and the worksite cleanup had previously been performed by Bayshore SC employees for several months prior to leasing Poch and Key. Colonna and Lenart testified that Bayshore SC leased Poch and Key to assist the remaining regular Bayshore SC employees in restoring the site to its original condition. Lenart, the Bayshore SC supervisor who dug the trench, testified that both leased and regular employees all worked together to disassemble the facilities, dig trenches, separate steel, burn wood, load equipment, and dispose of trash.

Because Bayshore SC qualified as Poch's and Key's statutory employer, it was immune from liability in tort under the Act's exclusivity provision.

## C. Extension of Tort Immunity to Bayshore Corp. as Parent of Subsidiary

Even if Bayshore SC qualified as a statutory employer, Petitioners contend the Court of Appeals erred in extending tort immunity to Bayshore Corp. based on a contractor/subcontractor analysis. Petitioners assert the appropriate analysis is governed by *Brown v. Moorhead Oil Co.*, 239 S.C. 604, 124 S.E.2d 47 (1962) and *Monroe v. Monsanto Co.*, 531 F.Supp. 426 (D.S.C.1982), as these cases assess the identity between a parent corporation and its subsidiary for workers' compensation and tort immunity purposes.

Applying this legal standard, Petitioners assert Bayshore Corp. cannot claim immunity based on its relationship to its subsidiary because Bayshore SC was a separate and distinct corporate entity at the time of the accident. In support of this claim, Petitioners characterize the parent-subsidiary relationship as follows: (1) Bayshore SC, rather than Bayshore Corp., was the "owner" of the project; (2) Bayshore Corp. set up Bayshore SC as a "separate entity to independently perform work in South Carolina"; (3) Bayshore Corp. and Bayshore SC were "formally recorded as being separate corporate entities at the time of the accident"; (4) the Board of Directors of both companies were not "identical"; (5) the Bayshore "entities kept separate corporate minutes"; (6) the corporations were headquartered and transacted business in separate locations; (7) the corporations hired and paid their own employees separately; (8) the corporations "strictly maintained separate books, account records, and bank accounts"; and (9) the corporations maintained separate federal tax identification numbers and were required to file separate tax reports.

## 1. Alter Ego Theory

We agree with Petitioners that the Court of Appeals applied an incorrect legal standard; however, as will be discussed, we conclude the Court of Appeals reached the correct result despite this error.

In assessing whether the employees could maintain a tort action against Bayshore Corp., we consider the following general rule:

A parent corporation is generally not immune from an action in tort by an injured employee of its subsidiary by virtue of the employee's entitlement to workers' compensation. Where an employee of a subsidiary is injured while working on property owned by the parent corporation and receives workers' compensation benefits from the subsidiary, the employee may maintain an action in tort against the parent corporation even though parent and subsidiary are covered by same policy of workers' compensation insurance.

However, a parent corporation's immunity has been recognized in some instances on the theory that the parent is

or may be found to be the alter ego of the employer-subsidiary corporation.

82 Am.Jur.2d *Workers' Compensation* § 90 (2003) (footnotes omitted); *see* Annotation, *Workers' Compensation Immunity as Extending to One Owning Controlling Interest in Employer Corporation,* 30 A.L.R.4th 948, § 2 (1984 & Supp.2013) (discussing alter ego theory by which a parent corporation may seek tort immunity via its interest in the employer-corporation; noting that immunity does not extend where: (1) parent and subsidiary are separate and distinct entities; or (2) there is evidence of fraud, abuse of corporate privilege, or an attempt to circumvent the law to avoid liability).

Initially, we note that Bayshore Corp., in seeking immunity, did not rely solely on the parent-subsidiary designation. Instead, Bayshore Corp. presented evidence through affidavits and deposition testimony to establish that the two corporations could be viewed as only one economic entity.

In examining the relationship between the two corporations, we recognize the correct approach is the one found in *Monroe v. Monsanto Company,* 531 F.Supp. 426 (D.S.C.1982).[7] *See* John D. DeDoncker, Note, *Adopting an Economic Reality Test When Determining Parent Corporations' Status for Workers' Compensation Purposes,* 12 J. Corp. L. 569, 577 (1987) (analyzing different theories to assess parent-subsidiary relationship for workers' compensation purposes; discussing *Monroe* and stating, "[t]he alter ego theory functions on the premise that when two corporations operate essentially as one, they should be considered as one for workers' compensation purposes").

In *Monroe,* the plaintiff sustained injuries while employed at the Fovil Manufacturing Company. *Monroe,* 531 F.Supp. at 427. The plaintiff lost his arm in a machine called the Gamble Cutter, which was designed, built, and placed in the Fovil plant by the Hale Manufacturing Company and the Monsanto Company. *Id.* After receiving workers' compensa-

---

7. Although the Court of Appeals referenced *Monroe,* it declined to apply it as the court believed the contractor/subcontractor analysis was more appropriate. *Poch,* 386 S.C. at 27 n. 3, 686 S.E.2d at 697 n. 3 ("Though we believe *Monroe* is persuasive, we do not believe it is controlling, and we rely upon other case law from South Carolina.").

tion benefits from Fovil, the plaintiff filed suit against Monsanto and Hale. *Id.* at 428. Monsanto owned all outstanding capital stock of Fovil and Hale. *Id.* at 431. The defendants moved for summary judgment on the ground the action was barred by the exclusivity provision of the Workers' Compensation Act. *Id.* at 427. The basis for the motion was their claim that both Fovil and Hale were wholly owned corporate subsidiaries of Monsanto and that all three corporations were in essence a single entity. *Id.* The plaintiff only opposed the motion as to Hale. *Id.* Ultimately, the United States District Court of South Carolina denied the motion, finding Hale was a separate and distinct corporate entity from that of the plaintiff's employer, Fovil. As a result, the court found that Hale could not escape tort liability. *Id.* at 434–35.

In reaching this conclusion, the court analyzed South Carolina law [8] and gleaned eight factors that courts should consider in determining whether two related businesses are separate and distinct corporations for workers' compensation purposes. *Id.* at 432–34. These factors may be assessed by answering the following questions:

(1) Did the two businesses maintain separate corporate identities?

(2) Did the two businesses maintain separate Boards of Directors?

(3) Did the two businesses transact business from different locations under different managers?

(4) Did the two businesses hire and pay their own employees?

(5) Did the two corporations hold themselves out to their employees as two separate identities?

(6) Did the two corporations engage in different business activities?

(7) Did the two corporations maintain separate books, bank accounts, and payroll records?

(8) Did the two corporations file separate tax returns?

---

**8.** Specifically, the court considered the following cases: (1) *Gordon v. Hollywood–Beaufort Package Corp.*, 213 S.C. 438, 49 S.E.2d 718 (1948); (2) *Brown v. Moorhead Oil Co.*, 239 S.C. 604, 124 S.E.2d 47 (1962); and (3) *Strickland v. Textron, Inc.*, 433 F.Supp. 326 (D.S.C.1977).

*Id.* at 434. Although the court enumerated these eight factors, it emphasized that these factors were not the only relevant factors and that none of the factors alone provided immunity. *Id.*

## 2. Application of *Monroe* Factors

 Keeping in mind that no one factor is controlling, the weight of the evidence supports a finding that Bayshore SC was the alter ego of Bayshore Corp.

First, the two businesses did not clearly maintain separate identities as Colonna, the president of both corporations, testified that "Bayshore" was used "interchangeably" in signing documents, including the lease agreement for the project and the Job Place contract. Furthermore, documents such as letterhead, employment applications, benefits packages, and safety manuals used at the South Carolina site displayed a standard Bayshore Corp. designation. In terms of workers' compensation coverage, Colonna testified that one policy covered all corporations but that separate, self-insured reserve funds were set up for each corporation.

Second, with the exception of two people, the corporations shared the same officers and directors. In fact, Bayshore SC's Board of Directors was comprised entirely of members of the Bayshore Corp.'s Board of Directors. All officers received their salaries from Bayshore Corp. Notably, the same legal counsel, safety director, and engineers were used for both corporations and paid by Bayshore Corp.

As to the third factor, Bayshore Corp. was headquartered in Virginia whereas Bayshore SC operated exclusively in South Carolina. However, Bayshore Corp. entered into the lease agreement in South Carolina, purchased the equipment to be used on the jobsite, and periodically sent several Bayshore Corp. employees to oversee the completion of the project. Significantly, all of the billing invoices and normal correspondence for Bayshore SC were sent to Bayshore Corp. in Cape Charles, Virginia. Bayshore Corp. also retained all of Bayshore SC's corporate and personnel files.

In terms of the fourth factor, Colonna testified that the hiring and firing of salaried employees at the South Carolina site was done by a Bayshore Corp. employee. He further

testified that salaried employees, who worked on the South Carolina site, received a paycheck from Bayshore Corp. and were provided 401(k) plans and healthcare coverage through Bayshore Corp. These salaried employees included: (1) Lenart, the production supervisor; (2) Brandon Rowe, the plant manager; and (3) Randy Maccoon, the quality control supervisor. Hourly employees were paid through Bayshore SC. Bayshore SC also hired the temporary workers, including Poch and Key, to assist on the site. Toward the conclusion of the project, the invoices for these workers were paid through the accounts payable department at Bayshore Corp.

Regarding the fifth factor, the two corporations did not hold themselves out to their employees as separate entities as Bayshore SC employees were provided with employment documents that were standard for Bayshore Corp.

As to the sixth factor, both corporations engaged in the same business activity of providing concrete forms for construction sites. Both corporations also used the same process and equipment in performing this work.

In terms of the seventh factor, the two corporations maintained separate books, accounting records, and bank accounts for purposes of financial accountability. However, Bayshore SC contributed to Bayshore Corp.'s gross revenues. More importantly, Bayshore Corp. was entirely responsible for the financial operation of Bayshore SC.

Finally, as to the eighth factor, the two corporations maintained separate tax identification numbers and filed separate tax returns. Admittedly, the separate tax return filings militate against the Respondents; however, this one factor, though weighty, is not dispositive in the workers' compensation context. Considering the preponderance of the evidence, we conclude that Bayshore Corp. and Bayshore SC operated as one economic entity.

Based on the foregoing, we find the circuit court and the Court of Appeals correctly determined that Bayshore Corp. was immune from the employees' tort actions as the two corporations could be viewed as only one economic entity.[9]

---

9. In applying the eight-factor *Monroe* test, the dissent reaches the opposite conclusion. The dissent's position, which is contrary to our

*See* 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 43.80 (Supp.2012) ("A holding company and its wholly owned subsidiary will be considered a single employer for workers' compensation purposes if the two corporations are so integrated and commingled that neither can be realistically viewed as a separate economic entity.").[10]

## D. Bayshore Corp.'s Status with Respect to Procurement of Workers' Compensation Insurance

If Bayshore Corp. and Bayshore SC were immune from tort liability due to their employment/corporate status, Petitioners claim the Court of Appeals erred in finding the corporations could benefit from this immunity as they failed to offer proof of or secure workers' compensation coverage for Poch and Key in violation of the provisions of the Act.

Citing section 42–5–40[11] of the South Carolina Code and this Court's decision in *Harrell v. Pineland Plantation, Ltd.,* 337 S.C. 313, 523 S.E.2d 766 (1999), Petitioners assert that "each entity who seeks to take advantage of Workers' Com-

---

view, the decision of the Court of Appeals, and the circuit court's holding, is based on no specific evidence. Rather, the dissent offers a cursory review of the few factors that favor its position. Although the *Monroe* test is not mathematically precise and no single factor is determinative, we believe the dissent may have overlooked the preponderance of the evidence to reach a desired result.

10. In view of this conclusion, we reject Petitioners' "co-subcontractor" contention as neither corporation comes within the definition of a "subcontractor." *See Black's Law Dictionary* 1437 (7th ed.1999) (defining "subcontractor" as "One who is awarded a portion of an existing contract by a contractor, esp. a general contractor").

11. Section 42–5–40 provides:

Any employer required to secure the payment of compensation under this Title who refuses or neglects to secure such compensation ... shall be liable during continuance of such refusal or neglect to an employee either for compensation under this Title or at law in an action instituted by the employee or his personal representative against such employer to recover damages for personal injury or death by accident and in any such action such employer shall not be permitted to defend upon any of the grounds mentioned in Section 42–1–510.

S.C.Code Ann. § 42–5–40 (1985). This code section was amended effective July 1, 2007. However, because the work-related accident occurred on June 6, 2002, we cite to the earlier version of the statute.

pensation immunity must demonstrate that it secured Workers' Compensation benefits for the statutory employee, even if the statutory employee's immediate employer has already secured those benefits."

Petitioners further assert that "neither Bayshore Corp. (VA) nor Bayshore SC secured compensation directly or indirectly for Poch and Key, nor did they meet the requirements of section 42–1–415(B)" of the South Carolina Code,[12] which provides a method by which a corporation can demonstrate that their statutory employees are covered by workers' compensation insurance at the time of hiring even though the corporation is not directly liable as a statutory employer.

Essentially, Petitioners challenge the following findings of the Court of Appeals: (1) section 42–5–40 concerns only the ability of an upstream employer to shift the burden of workers' compensation coverage onto the state Uninsured Employer's Fund and cannot be applied to prevent an employer from benefitting from the exclusivity provision; and (2) section 42–1–415(B) applies only to situations when a person seeks to qualify for reimbursement from the Uninsured Employer's Fund.

### Insurance Requirements as Interpreted in *Harrell*

We find the Court of Appeals' interpretation of section 42–5–40 is erroneous as it is in direct conflict with this Court's decision in *Harrell*. In that case, Harrell, an employee of Folk Land Management, Inc., filed a negligence action against Pineland Plantation, Ltd., the partnership that owned and operated a plantation maintained as a vacation resort where Harrell sustained an injury for which he received workers' compensation benefits from Folk. *Harrell*, 337 S.C. at 317–19, 523 S.E.2d at 768–69. After settling his workers' compensa-

---

**12.** Section 42–1–415 provides in relevant part:

> To qualify for reimbursement under this section, the higher tier subcontractor, contractor, or project owner must collect documentation of insurance as provided in subsection (A) on a standard form acceptable to the commission. The documentation must be collected at the time the contractor or subcontractor is engaged to perform work and must be turned over to the commission at the time a claim is filed by the injured employee.

S.C.Code Ann. § 42–1–415(B) (Supp.2012).

tion claim against Folk, Harrell brought a tort action against Pineland for negligence. *Id.* at 319, 523 S.E.2d at 769. The circuit court dismissed Harrell's complaint on the ground his exclusive remedy was under the Workers' Compensation Act. *Id.*

On appeal, the Court of Appeals reversed the circuit court's order, finding Harrell could sue Pineland in an action at law. *Id.* This Court granted a writ of certiorari to consider whether Pineland was Harrell's statutory employer under the Act and whether Pineland was immune from tort pursuant to the Act's exclusive remedy provision even though it did not purchase its own workers' compensation coverage or otherwise qualify as self-insured under the Act. *Id.* at 320, 523 S.E.2d at 769.

Having found Pineland was Harrell's statutory employer, we analyzed whether Pineland could claim immunity under the Act even though it did not provide any form of workers' compensation insurance. *Id.* at 325, 523 S.E.2d at 772. Because Pineland failed to secure the payment of compensation as prescribed by sections 42–5–10 and –20 of the Act, we held that Pineland could not avail itself of tort immunity under the Act's exclusive remedy provision. *Id.* at 331, 523 S.E.2d at 775. In reaching this conclusion, we explained that "an employer who fails to secure the payment of compensation as prescribed in section 42–5–20 *loses* its immunity under the Act's exclusive remedy provision" and becomes liable either under the Act or in an action at law pursuant to section 42–5–40. *Id.* at 327, 523 S.E.2d at 773 (emphasis added).

In *Glover v. United States,* 337 S.C. 307, 523 S.E.2d 763 (1999), we reaffirmed our decision in *Harrell,* explaining that:

> Under the Act, the basic duty of any employer, whether it be the direct employer or statutory employer, is the obligation to secure the payment of compensation as prescribed by section 42–5–20. Compliance with this obligation is the *quid pro quo* exacted from the employer in exchange for immunity. Thus, a statutory employer who fails to secure the payment of compensation as prescribed by section 42–5–20 may not claim immunity under the Act.

*Id.* at 310–11, 523 S.E.2d at 764.

## 1. Procurement of Insurance

 Based on *Harrell* and its progeny, Petitioners are correct that Bayshore Corp. and Bayshore SC could have lost

their tort immunity had they failed to procure workers' compensation coverage for Poch and Key at the time of hiring. However, we hold the corporations preserved their immunity as there is evidence to support the circuit court's finding that "both retained worker's compensation insurance that would have covered [Petitioners] had Job Place/Personnel Resources failed to secure coverage."

Although a lack of coverage was not directly contested before the circuit court, the Respondents nevertheless offered the affidavit of Richard Stadler, the construction underwriter for St. Paul/Travelers Insurance Company. Stadler attested that Bayshore Corp. and Bayshore SC had workers' compensation coverage at the time of the accident as there was an "insurance policy [that] cover[ed] Bayshore Concrete Products Corporation and of South Carolina Inc." [13] Additionally, Colonna, who is the president of both corporations, testified that workers' compensation coverage was secured for the South Carolina site at the time of the accident. He further noted that "an excess or umbrella policy," which was above the self-insured reserved, covered "all the companies." [14] Thus, without evidence to the contrary, we find the corporate entities complied with the requirements of *Harrell*.

 The dissenters reach a contrary result by placing form over substance as to the issue of procurement of insurance by Bayshore Corp. and Bayshore SC. Without dispute, evidence of compliance with section 42–5–20 is required of every employer subject to the provisions of the Workers' Compensation Act. Section 42–5–20, however, allows employ-

13. The dissent refuses to accept this affidavit as evidence of proof of workers' compensation insurance. The dissent, however, neither challenges the truthfulness of the affidavit nor offers supporting authority for its position. Accordingly, we discern no basis for which to reject the affidavit as it is by its very nature a sworn statement intended as documentary evidence in a legal proceeding. *See Marine Wharf & Storage Co. v. Parsons*, 49 S.C. 136, 139, 26 S.E. 956, 966 (1897) ("An 'affidavit' is defined in 1 Am. & Eng. Enc. Law, p. 307, to be 'a formal written (or printed) voluntary ex parte statement sworn (or affirmed) to before an officer authorized to take it, to be used in legal proceedings.' ").

14. Despite Colonna's use of the term "self-insured," there was an insurance policy in existence that provided workers' compensation coverage.

ers to provide proof of insurance or financial ability to pay through various sources, including self-insurance. Notably, the responsibility for filing proof of compliance with section 42–5–20 falls on the insurance carrier unless the employer is self-insured. Here, contrary to the dissenters' assumption, Bayshore's alleged umbrella insurance policy did not transform Bayshore into a self-insured employer. Thus, because Bayshore procured the requisite insurance policy and was not self-insured, the insurance carrier bore the responsibility of providing proof of insurance coverage. Should Bayshore be penalized for failing to do something that it was not required to do? We think not. We must also recognize there was no allegation or evidence in the record to suggest that proof of compliance with section 42–5–20 was not filed.

Furthermore, we emphasize that this case did not go to trial but, rather, was presented in the posture of Respondents' motion for summary judgment or alternative motion to dismiss. Undoubtedly, the parties were aware that the evidence presented at this hearing would include affidavits. The affidavit of the construction underwriter for St. Paul/Travelers Insurance Company specifically stated that the insurance policy covered Poch's and Key's workers' compensation claims. This affidavit was not challenged during the motion hearing. Yet, inexplicably, the dissenters find this unchallenged affidavit from the insurance carrier to be insufficient evidence at the summary judgment/motion to dismiss hearing.

Having concluded that Bayshore Corp. and Bayshore SC secured workers' compensation coverage, we find Petitioners' reliance on section 42–1–415(B) is misplaced as that provision applies only in cases involving reimbursement from the Uninsured Employer's Fund and neither corporation in the instant case sought to transfer liability to the Fund. *See Hopper v. Terry Hunt Constr.*, 383 S.C. 310, 315, 680 S.E.2d 1, 3 (2009) (interpreting section 42–1–415 and stating, "Liability may only be transferred from the higher tier contractor to the Fund after the higher tier contractor has properly documented the lower tier contractor's claim that it retains workers' compensation insurance").

## III. Conclusion

Based on the foregoing, we find the Court of Appeals correctly affirmed the decision of the circuit court as Bayshore

SC and Bayshore Corp. proved they were entitled to immunity from tort under the Act's exclusivity provision. However, in reaching this decision, the Court of Appeals erred in its analysis as it should have utilized the alter ego theory rather than the contractor/subcontractor doctrine in determining whether tort immunity extended to Bayshore Corp. Furthermore, the Court of Appeals misinterpreted this Court's decision in *Harrell* as a statutory employer can lose its immunity under the Act's exclusive remedy provision if the employer fails to secure the payment of workers' compensation as prescribed by the Act. Because Bayshore SC and Bayshore Corp. secured such coverage, they retained their immunity. Accordingly, we affirm as modified the decision of the Court of Appeals.

**AFFIRMED AS MODIFIED.**

KITTREDGE, J., and Acting Justice JAMES E. MOORE, Concur.

TOAL, C.J., and PLEICONES, J., concur in part and dissent in part in separate opinions.

Chief Justice TOAL.

I respectfully concur in part, and dissent in part. First, I agree wholeheartedly with the majority's adoption of the *Monroe*[15] factors and its application of these factors in the instant case. In my opinion, the evidence supports a finding that Bayshore SC was the alter ego of Bayshore Corp. and both should be immune from liability in tort as statutory employers of Poch and Key.

As to Petitioners' next argument, that the court of appeals erred in finding that Bayshore Corp. and Bayshore SC could benefit from the immunity because they failed to offer proof of or secure workers' compensation coverage in violation of the Act and this Court's decision in *Harrell*,[16] the majority was correct in finding that the court of appeals misinterpreted *Harrell*. I agree with the majority's interpretation that,

---

15. *Monroe v. Monsanto*, 531 F.Supp. 426 (D.S.C.1982).

16. *Harrell v. Pineland Plantation, Ltd.*, 337 S.C. 313, 523 S.E.2d 766 (1999).

pursuant to *Harrell*, a statutory employer becomes liable under section 42–5–40 of the South Carolina Code [17] for failure to secure workers' compensation insurance for the statutory employee in accordance with the Act.

However, I join Justice Pleicones's dissenting opinion because it is my view that Bayshore Corp. and Bayshore SC did not submit adequate proof that they secured or filed evidence of workers' compensation coverage as required by the Act and *Harrell*. *See* S.C.Code Ann. § 42–5–20 (Supp.1998) ("Every employer who accepts the provisions of this title relative to the payment of compensation shall insure and keep insured his liability thereunder in any authorized corporation, association, organization, or mutual insurance association formed by a group of employers so authorized or shall furnish to the commission satisfactory proof of his financial ability to pay directly the compensation in the amount and manner and when due as provided for in this title."); *id.* § 42–5–30 (Supp.2012) ("Every employer accepting the compensation provisions of this title shall file with the Commission, in form prescribed by it, annually or as often as may be necessary evidence of his compliance with the provisions of § 42–5–20 and all others relating thereto."); *Harrell*, 337 S.C. at 328, 523 S.E.2d at 774 (refusing "to adopt an interpretation of the Act that would allow [an employer] to claim tort immunity without complying with the quintessential obligation imposed upon [the employer] by the Act—the duty to *secure* the payment of compensation." (emphasis in original) (alterations added)). With respect to Bayshore SC's coverage, the corporations submitted an affidavit of Richard Stadler, the construction underwriter for St. Paul/Travelers Insurance Company as proof of coverage.[18] In my view, the content of this affidavit is grossly insufficient to establish that either corporation procured workers' compensation insurance, filed evidence of workers' compensation insurance, or filed evidence of financial ability sufficient to qualify as self-insured. *See* S.C.Code Ann. §§ 42–5–10 (1985); 42–5–20; 42–5–30; 42–5–40. Stadler's affidavit does not contain the requisite specificity required under the statute, as it does not refer to the precise type of

---

17. *See* S.C.Code Ann. § 42–5–40 (1985).

18. I note that Stadler's affidavit makes no mention of Bayshore Corp.

coverage or time period covered, and thus, we are unable to discern the kind and scope of coverage allegedly in effect at the time of the accident. Moreover, there is no evidence that the corporations filed proof of insurance with the Commission. The majority further relies on the testimony of Keith Colonna, the president of both corporations, who testified that the corporations secured workers' compensation insurance prior to the accident, noting that "an excess or umbrella policy" above the self-insured reserve, covered "all the companies." I agree with Justice Pleicones that "the only inference to be drawn from this record in light of Mr. Colonna's testimony is that both Bayshore entities viewed themselves as self-insured, and that the underwriter was referring to a liability umbrella policy." Thus, I join his dissent in part, as I, too, am unwilling to hold that a mere representation of coverage by an employer is sufficient to meet the statutory requirements, and I disagree with the majority's holding that the corporations retained tort immunity because they procured workers' compensation for the employees. The majority's conclusion is simply unsupported by this record.

Therefore, I would hold that because neither Bayshore SC nor Bayshore Corp. complied with the insuring requirement of the Act, they are liable in tort to under section 42-5-40. Accordingly, I would reverse the court of appeals.

Justice PLEICONES.

I concur in part and dissent in part. I agree that we should explicitly adopt the *Monroe*[19] test here, but reach the opposite result when I apply that test to these facts. Further, I find no evidence that either Bayshore entity purchased workers' compensation liability insurance within the meaning of our statutes and conclude that neither can invoke tort immunity.

In my opinion, there is no evidence in the record that either Bayshore SC or Bayshore Corp "insure[d] and ke[pt] insured his liability" as required by S.C.Code Ann. § 42-5-20 (Supp. 2012) and therefore both are subject to a suit in tort.

S.C.Code Ann. § 42-5-40 (Supp.2012). An affidavit from an underwriter to the effect "[t]hat the insurance policy [covering both Bayshore entities] as written would have provided Work-

---

19. *Monroe v. Monsanto Co.,* 531 F.Supp. 426 (D.S.C.1982).

ers' Compensation coverage" for petitioners is insufficient to support a finding that the policy to which he refers contains the provisions required by S.C.Code Ann. § 42–5–70 (1984) or that imposed by § 42–5–80(A) (Supp.2012). In fact, the only inference to be drawn from this record in light of Mr. Colonna's testimony is that both Bayshore entities viewed themselves as self-insured, and that the underwriter was referring to a liability umbrella policy. There is neither evidence nor any representation that the Bayshore entities met the South Carolina statutory requirements for self-insurers. *See* S.C.Code Ann. § 42–5–20; § 42–5–50 (1984); § 42–5–10 (Supp.2012). I am unwilling to hold that an employer's mere representation that it is self-insured is sufficient to satisfy the statutes, nor am I willing to agree that an umbrella policy is sufficient to meet the insuring requirements. I disagree with the majority's conclusion that there is evidence the Bayshore entities directly purchased workers' compensation liability coverage.

Based upon my view of the evidence, I conclude neither Bayshore SC nor Bayshore Corp. complied with the insuring requirement of § 42–5–20, and therefore may be liable in tort to petitioners pursuant to § 42–5–40. *Harrell v. Pineland Plantation, Ltd.*, 337 S.C. 313, 523 S.E.2d 766 (1999).

I agree we should explicitly adopt the eight-factor *Monroe* test for determining the relationship between parent and subsidiary in the workers' compensation area. In light of this decision, we should remand the case in order to allow the parties to present any additional relevant evidence, and to allow the Commission to make a factual determination. If, however, we are to apply this new test in this appeal, then viewing these factors in light of the facts as recited by the majority, I would conclude that Bayshore SC and Bayshore Corp. are separate economic entities. The businesses maintained separate corporate identities, had separate Boards of Directors albeit with many common members, were located in two different locations, hired and paid at least some of their own employees, maintained separate books, bank accounts, and payroll records, and filed separate tax returns. I therefore disagree with the majority's conclusion that Bayshore Corp. shares Bayshore SC's status as petitioner's statutory employer. As explained above, I also disagree with the majority's finding that the Bayshore entities met the insuring

requirement found in § 42–5–20. I therefore would find both Bayshore SC and Bayshore Corp. may be liable in tort to petitioners under § 42–5–40. Finally, I agree with the majority that we should explicitly adopt the *Monroe* test, and I also agree that § 42–1–415(B) is inapplicable here.

Because I find that both Bayshore SC and Bayshore Corp. failed to meet their statutory workers' compensation insuring obligations, I would reverse the decision of the Court of Appeals which upheld the circuit court finding that both Bayshore SC and Bayshore Corp. are immune from tort liability