GEATHERS, J.:
**363 In this wrongful death action, Appellant CNA Holdings, LLC challenges the circuit court's denial of its motions for a judgment notwithstanding the verdict (JNOV), new trial absolute, and new trial nisi remittitur. Appellant argues the circuit court erred by concluding that Dennis Seay was not a statutory employee of Appellant's predecessor in interest, Hoechst Celanese Corporation (Celanese), pursuant to section 42-1-400 of the South Carolina Code (2015). Appellant also argues the circuit court erred by (1) declining to grant a mistrial on the ground of jury misconduct; (2) admitting into evidence a video of Seay crying out in pain; and (3) upholding the amount of the jury's verdict. We affirm.
**364 FACTS/PROCEDURAL HISTORY
From 1971 to 1980, Seay performed maintenance work at the Celanese polyester plant in Spartanburg. Celanese had contracted with Daniel Construction Company, Seay's employer, to handle all maintenance work at its Spartanburg plant, and Daniel assigned Seay to work at this plant. Seay's duties included maintaining and repairing pumps, valves, condensers, and other equipment. In performing this work, Seay came into contact with asbestos gaskets, packing, and insulation materials. Tragically, in August 2013, Seay was diagnosed with mesothelioma, a type of lung cancer.
On September 25, 2013, Seay and his wife, Linda Seay, filed this action against Appellant and several other defendants, alleging negligence by failure to warn Seay of the dangers of asbestos, failure to provide adequate safety measures against asbestos dust, and failure to provide safe environmental conditions in the Spartanburg plant. Seay died from advanced mesothelioma on December 29, 2014. Subsequently, Seay's daughter, Respondent Angie Keene, amended the complaint to add causes of action for wrongful death and survival. Appellant then filed a motion to dismiss pursuant to Rule 12(b)(6), SCRCP, or, in the alternative, for summary judgment pursuant to Rule 56, SCRCP. The basis for this motion was that Seay was a statutory employee of Celanese and, therefore, his exclusive remedy was under the South Carolina Workers' Compensation Act, S.C. Code Ann. §§ 42-1-10 to 42-19-50.[1]
The circuit court denied the motion and conducted a trial from September 28 through October 2, 2015, and from October 6 through 8, 2015. At the conclusion of the trial, the jury found that the negligence of Celanese caused Seay's mesothelioma and awarded $2 million in actual damages to Seay's estate for its survival claim; $5 million in actual damages to Seay's estate for its wrongful death claim; and $5 million in actual damages to Linda Seay for her loss of consortium claim.
**365 The jury also found Celanese was willful, wanton, and reckless and awarded $2 million in punitive damages. Appellant filed motions for a JNOV, new trial absolute, and new trial nisi remittitur, which the circuit court denied. This appeal followed.
*188 ISSUES ON APPEAL
1. Did the circuit court err by declining to grant a JNOV on the ground that Seay was a statutory employee of Celanese?
2. Did the circuit court err by declining to grant a mistrial on the ground of jury misconduct?
3. Did the circuit court err by admitting into evidence a video showing Seay crying out in pain?
4. Did the circuit court err by upholding the amount of the jury's verdict?
STANDARD OF REVIEW
Statutory Employee
"[D]etermination of the employer-employee relationship for workers' compensation purposes is jurisdictional. Consequently, this [c]ourt has the power and duty to review the entire record and decide the jurisdictional facts in accord with the preponderance of the evidence." Poch v. Bayshore Concrete Prod./S.C., Inc. , 405 S.C. 359, 367, 747 S.E.2d 757, 761 (2013) (quoting Glass v. Dow Chem. Co. , 325 S.C. 198, 201-02, 482 S.E.2d 49, 51 (1997) ).
Mistrial
"The granting or denying of a motion for mistrial is within the sound discretion of the trial [court]. Absent an abuse of discretion, the decision of the trial [court] will not be overturned on appeal." Mishoe v. QHG of Lake City, Inc. , 366 S.C. 195, 202, 621 S.E.2d 363, 366 (Ct. App. 2005) (citation omitted). "An abuse of discretion occurs [when] the trial court is controlled by an error of law or [when] the [c]ourt's order is based on factual conclusions without evidentiary support." City of Columbia v. Pic-A-Flick Video, Inc. , 340 S.C. 278, 282, 531 S.E.2d 518, 521 (2000).
**366 Evidence
"The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may only disturb a ruling admitting or excluding evidence upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.' " Burke v. Republic Parking Sys., Inc. , 421 S.C. 553, 558, 808 S.E.2d 626, 628 (Ct. App. 2017) (quoting State v. Commander , 396 S.C. 254, 262-63, 721 S.E.2d 413, 417 (2011) ). "Determining whether prejudice exists 'depends on the circumstances[,]' and 'the materiality and prejudicial character of the error must be determined from its relationship to the entire case.' " Id. (quoting State v. Taylor , 333 S.C. 159, 172, 508 S.E.2d 870, 876 (1998) ). "Prejudice in this context means 'there is a reasonable probability the jury's verdict was influenced by the wrongly admitted or excluded evidence.' " Id. (quoting Vaught v. A.O. Hardee & Sons, Inc. , 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005) ).
New Trial/Excessive Damages
"[I]f a verdict is so grossly excessive and shockingly disproportionate that it indicates the jury was motivated by passion, caprice, prejudice, or other consideration not founded on the evidence[,] then it is the duty of the trial court and the appellate court to set aside the verdict absolutely." Caldwell v. K-Mart Corp. , 306 S.C. 27, 33, 410 S.E.2d 21, 25 (Ct. App. 1991). Nonetheless, "the jury's determination of damages is entitled to substantial deference[,]" and the circuit court's decision on whether to grant a new trial based on the amount of the verdict "will not be disturbed on appeal unless it clearly appears the exercise of discretion was controlled by a manifest error of law." Welch v. Epstein , 342 S.C. 279, 303, 536 S.E.2d 408, 420 (Ct. App. 2000).
LAW/ANALYSIS
I. Statutory Employee
Appellant asserts the circuit court erred by declining to grant a JNOV on the ground that Seay was a statutory employee of Celanese. Appellant argues that Seay's maintenance and repair work on plant equipment was a part of the business of Celanese, which was manufacturing polyester fiber, **367 because the plant would not have been able to properly function without the maintenance and repair work performed by Seay and other Daniel employees.
"The statutory employee doctrine converts conceded non-employees into employees *189 for purposes of the Workers' Compensation Act." Glass , 325 S.C. at 201 n.1, 482 S.E.2d at 50 n.1. "The rationale is to prevent owners and contractors from subcontracting out their work to avoid liability for injuries incurred in the course of employment." Id. Section 42-1-400 created the concept of a statutory employee:
When any person, in this section and [s]ections 42-1-420 and 42-1-430 referred to as "owner," undertakes to perform or execute any work which is a part of his trade, business[,] or occupation and contracts with any other person (in this section and Sections 42-1-420 to 42-1-450 referred to as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this title [that] he would have been liable to pay if the workman had been immediately employed by him.
S.C. Code Ann. § 42-1-400 (2015) (emphasis added). Pursuant to section 42-1-540, the exclusive remedy for an injured statutory employee is the Workers' Compensation Act. Therefore, even if a business organization does not have a direct employment relationship with a worker, the Workers' Compensation Act limits the worker to its provisions as the exclusive remedy for injuries he received while engaged in activity considered part of the organization's trade, business, or occupation.
Here, in its order denying Appellant's JNOV motion, the circuit court found that the "trade, business[,] or occupation" of Celanese was the manufacture of polyester fibers, and all Celanese employees were engaged in making these fibers. The circuit court also found the maintenance and repair work performed by Seay and other Daniel employees was "significantly different" from the work performed by Celanese employees and, therefore, concluded that Seay was not a statutory employee of Celanese. The court explained, "Although maintenance of the equipment in the plant may have been important to Celanese's operation, it does not follow that such **368 maintenance was a 'part or process' of its synthetic fiber manufacturing business."
Our courts have traditionally applied three tests in determining whether a worker is engaged in activity that is part of the organization's trade, business, or occupation: (1) the activity is an important part of the organization's business or trade; (2) the activity is a necessary, essential, and integral part of the organization's business; or (3) the activity has previously been performed by the organization's employees. Olmstead v. Shakespeare , 354 S.C. 421, 424, 581 S.E.2d 483, 485 (2003) (emphases added). These tests were first articulated by our supreme court in 1988 in Ost v. Integrated Products, Inc. , 296 S.C. 241, 245, 371 S.E.2d 796, 798-99 (1988) by drawing on three previous opinions of the court. See Bridges v. Wyandotte Worsted Co. , 243 S.C. 1, 132 S.E.2d 18 (1963), overruled on other grounds by Sabb v. S.C. State Univ. , 350 S.C. 416, 422, 567 S.E.2d 231, 234 (2002) ; Boseman v. Pacific Mills , 193 S.C. 479, 8 S.E.2d 878 (1940) ; Marchbanks v. Duke Power Co. , 190 S.C. 336, 2 S.E.2d 825 (1939).[2] However, the court has acknowledged, "Since no easily applied formula can be laid down for determining whether work in a particular case meets these tests , each case must be decided on its own facts." Olmstead , 354 S.C. at 426, 581 S.E.2d at 486 (emphasis added) (quoting Glass , 325 S.C. at 201, 482 S.E.2d at 51 ); accord Ost , 296 S.C. at 244, 371 S.E.2d at 798 ; see also Meyer v. Piggly Wiggly No. 24, Inc. , 338 S.C. 471, 473, 527 S.E.2d 761, 763 (2000) ("Only one of these three tests need *190 be met[,] but there is no easily applied formula and each case must be decided on its own facts."). **369 Ultimately, "[t]he guidepost is whether or not that which is being done is or is not a part of the general trade, business[,] or occupation of the owner." Id. at 473-74, 527 S.E.2d at 763 (emphasis added) (alteration in original) (quoting Hopkins v. Darlington Veneer Co. , 208 S.C. 307, 311, 38 S.E.2d 4, 6 (1946) ). Simply put, "[e]mployees who work for the subcontractor but are not employed to do the work that the owner would normally do would not have a statutory employment relationship with the owner." Harrell v. Pineland Plantation, Ltd. , 337 S.C. 313, 323, 523 S.E.2d 766, 771 (1999).
The parties in the present case dispute the significance and precedential value of two relatively recent supreme court opinions, namely Abbott v. The Ltd., Inc. , 338 S.C. 161, 164, 526 S.E.2d 513, 514 (2000), and Olmstead . In Abbott , the plaintiff, who worked for a common carrier, slipped and fell on the premises of a retailer while he was delivering goods to the retailer. 338 S.C. at 162, 526 S.E.2d at 514. The supreme court reversed this court's conclusion that the plaintiff was the retailer's statutory employee. Id. at 164, 526 S.E.2d at 514. The court stated,
The fact that it was important to Retailer to receive goods does not render the delivery of goods an important part of Retailer's business. "The mere fact that transportation of goods to one's place of business is essential for the conduct of the business does not mean that the transportation of the goods is a part or process of the business."
Id. at 163-64, 526 S.E.2d at 514 (second and third emphases added) (quoting Caton v. Winslow Bros. & Smith Co. , 309 Mass. 150, 34 N.E.2d 638, 641 (1941) ).
In Olmstead , our supreme court affirmed this court's conclusion that the plaintiff, an employee of a common carrier, was not a statutory employee of the defendant, a business that designed and manufactured fiberglass products. 354 S.C. at 426, 581 S.E.2d at 486. The plaintiff loaded the defendant's fiberglass utility poles onto a trailer for delivery to the defendant's customer, and the defendant then instructed the plaintiff to remove some defective poles. Id. at 422, 581 S.E.2d at 484. While removing these poles, the plaintiff was injured. Id.
The court conceded that delivery by common carrier was important to the defendant's operation but held, "it does not **370 follow that such delivery was 'part or process' of its manufacturing business." Id. at 426, 581 S.E.2d at 486 (quoting Abbott , 338 S.C. at 164, 526 S.E.2d at 514 ).
Abbott represents a change in this state's jurisprudence on what activity constitutes "part of [the owner's] trade, business[,] or occupation" under section 42-1-400, and likely conflicts with cases other than the ones we explicitly overruled in footnote 1 of the Abbott opinion. As such, we now overrule all prior cases to the extent they are in conflict with our holding in Abbott and now in this case .
Id. at 426-27, 581 S.E.2d at 486 (emphasis added). Respondents argue that this language applies to all types of contract workers, not merely employees of common carriers, and that the circuit court in the present case correctly interpreted Olmstead as having a broad impact. On the other hand, Appellant argues that Olmstead and Abbott are not binding on this court because those opinions addressed statutory employment in the transportation setting whereas the present case involves maintenance.
Regardless of what the court meant by "a change in this state's jurisprudence,"[3] the logic employed by the court in Abbott and Olmstead brought new clarity to the abundance of case law on this issue and this logic is binding in the present case. Accordingly, the circuit court correctly determined that even though the maintenance work Seay performed was essential for Appellant's conduct of manufacturing polyester fiber, it does not mean that equipment maintenance was a part or process of Appellant's manufacturing business. In sum, the analysis in Abbott and Olmstead is true to the legislative intent underlying section 42-1-400, which seeks to *191 determine whether the type of work performed by the worker is the same type of work "the owner" has established as its business, and its logic applies across all trades, businesses, and occupations, allowing each case to be decided on its own facts.
This court's more recent precedent is consistent with the analysis in Abbott and Olmstead . In Johnson v. Jackson , one of the defendants, a full-service transportation company specializing in shipping high-value technological equipment, had contracted with a temporary employment agency "to use **371 several of its workers, including [the plaintiff], to load computers at Palmetto Health for subsequent delivery to HP Financial Services." 401 S.C. 152, 156, 735 S.E.2d 664, 666 (Ct. App. 2012). This court held that the plaintiff was a statutory employee of the company and distinguished the cases cited by the plaintiff by observing that in each of those cases, "transportation was not a main and integral part of the defendant's business" and "the basic operation of the putative employer differed greatly from the activity in which the plaintiff was engaged at the time of injury." Id. at 164, 735 S.E.2d at 670 (emphasis added). The court stressed, "Here, [the defendant's] business is transportation of technological equipment, which necessarily includes packaging, loading, and unloading that equipment." Id.
Appellant also argues that previous appellate opinions addressing contract workers in a maintenance setting compel the court to conclude that Seay was Appellant's statutory employee: "[C]ourts applying South Carolina law have held for decades that maintenance is an important and essential part of a manufacturing business."[4] However, this type of sweeping statement contradicts longstanding precedent acknowledged by Appellant that cautions, "no easily applied formula can be laid down for the determination of whether ... work in a given case is a part of the general trade, business[,] or occupation of the principal employer" and that "[e]ach case must be determined on its own facts."
**372 Ost , 296 S.C. at 244, 371 S.E.2d at 798. Therefore, we reject Appellant's contention that only those opinions addressing a maintenance setting have any precedential value to the present case. Nonetheless, we will address these opinions below for the benefit of the bench and bar.
Appellant cites Smith v. T.H. Snipes & Sons, Inc. , 306 S.C. 289, 411 S.E.2d 439 (1991), in support of its argument that Seay was a statutory employee. In Smith , the defendant hired the plaintiff's decedent, a self-employed welder, to repair a metal shearing machine used in the defendant's business operation. 306 S.C. at 290, 411 S.E.2d at 439. The welder was fatally injured while repairing the machine. Id. However, in applying the three alternative tests for determining whether a worker was engaged in activity that is part of the defendant's trade, business, or occupation, the court noted, "the evidence as to these considerations was the object of stipulations agreed upon prior to the evidentiary hearing." Id. at 292, 411 S.E.2d at 440. Further, the opinion does not indicate the content of the stipulations or the type of business in which the defendant engaged or otherwise elaborate on the facts. Therefore, we question whether this opinion is applicable to the analysis in the present case.
Appellant also cites Wheeler v. Morrison Mach. Co. , 313 S.C. 440, 438 S.E.2d 264 (Ct. App. 1993). In Wheeler , the plaintiff worked for an asbestos removal contractor, and while *192 removing asbestos at a Springs Industries plant, he fell into a piece of textile equipment, injuring his right hand. Id. at 441, 438 S.E.2d at 265. Springs had an ongoing maintenance program that included removing and disposing of asbestos from plant machinery and its connecting pipes, and Springs employees routinely performed this maintenance. Id. at 443, 438 S.E.2d at 266. When asbestos removal became subject to a licensing requirement, Springs began to hire outside contractors specializing in asbestos removal to perform this maintenance but it also had some employees who were licensed for emergency asbestos removal. Id. The plaintiff was injured during this time period. Id. This court concluded that the plaintiff was engaged in work that was part of Springs' "trade[,] business[,] or occupation." Id. **373 In addition to the fact that the defendant's own employees were engaging in the activity in which the plaintiff was involved, the court was persuaded by the testimony of an employee of the defendant stating that this particular activity was "necessary for the fabric or the finishing process" at the plant and there was no way to "do the maintenance work on the pipe in the area" of the project in question "without removing the asbestos." Id. at 443-44, 438 S.E.2d at 266 (emphasis added). However, we are bound by the supreme court's subsequent opinion in Olmstead distinguishing between an activity that is important to, or necessary for, the defendant's operation and activity that is actually part of that operation. See Olmstead , 354 S.C. at 426, 581 S.E.2d at 486 (stating that while delivery of the defendant's product to its customer by common carrier was important to the defendant's operation, "it does not follow that such delivery was ' "part or process" ' of its manufacturing business" (quoting Abbott , 338 S.C. at 164, 526 S.E.2d at 514 ) ).
Post-dating Olmstead is this court's opinion in Edens v. Bellini , 359 S.C. 433, 597 S.E.2d 863 (Ct. App. 2004). In Edens , a mechanical contracting firm had assigned the plaintiff's decedent to the Abbeville plant of a textile company where he assisted the company's employees "in various plant-related projects for about a year prior to his fatal on-the-job accident." 359 S.C. at 437-38, 597 S.E.2d at 865. On the day of the accident, the decedent had been helping plant employees with "install[ing] a cylinder on the door of a dye vat in the robotic shuttle area." Id. at 438, 597 S.E.2d at 865. When he later returned to this area to check for any leakage, the shuttle accidentally pinned the decedent against a dye vat, and he later died from his injuries. Id. at 438, 597 S.E.2d at 866.
In concluding that the decedent's work on the dye vat project met all three tests for determining whether a worker is a statutory employee, this court relied on the affidavits of the decedent's supervisor (also an employee of the mechanical contracting firm) and a manager employed by the defendant. Id. at 443-44, 597 S.E.2d at 868-69. The supervisor stated that the decedent assisted the defendant's maintenance associates when they requested it but he did not bring any "specific or unique expertise to the project." Id. at 444, 597 S.E.2d at 869. The supervisor also stated, "Maintaining operations equipment **374 in the dye package plant was an important and necessary part of [the defendant's] business at the Abbeville Plant." Id. at 443, 597 S.E.2d at 869.
The affidavit of the defendant's manager tracked the language of all three tests first articulated in the 1988 opinion in Ost -he stated that the decedent was under the direction of the defendant's employees when he was helping them modify the door to a dye vat and that the defendant's employees could have performed this work, which was neither special nor unique. Id. at 444, 597 S.E.2d at 869. The manager also stated,
Maintaining operations equipment and machinery in the dye package plant and modifying the dye vats in the dye package plant to make them more productive were important and necessary parts of [the defendant's] business at the Abbeville plant. Making the dye vats productive was an integral aspect of the dye package plant operations . Therefore, the work done to the door of the dye vat at issue was an important part of [the defendant's] operations in Abbeville.
Id. (emphases added). These affidavits cinched the case outcome in the defendant's *193 favor. However, going forward, we decline to automatically assign probative value to any self-serving affidavit of a party's representative when determining whether the preponderance of the evidence shows a worker's activity is actually part of the trade, business, or occupation of the owner. Simply asserting that an activity is part of the owner's trade, business, or occupation does not make it so. See Poch , 405 S.C. at 367, 747 S.E.2d at 761 ("[D]etermination of the employer-employee relationship for workers' compensation purposes is jurisdictional. Consequently, this [c]ourt has the power and duty to review the entire record and decide the jurisdictional facts in accord with the preponderance of the evidence." (quoting Glass , 325 S.C. at 201-02, 482 S.E.2d at 51 ) ); Meyer, 338 S.C. at 473-74, 527 S.E.2d at 763 ("[T]he guidepost is whether or not that which is being done is or is not a part of the general trade, business[,] or occupation of the owner." (emphasis added) (first alteration in original) (quoting Hopkins , 208 S.C. at 311, 38 S.E.2d at 6 ) ).
Nonetheless, to the extent that the maintenance cases cited by Appellant have precedential value, the unique facts of the **375 present case support the circuit court's conclusion that Seay's work, while important to the manufacturing process performed by Celanese employees, was not part of that process and, thus, Seay was not a statutory employee of Celanese. Only Daniel employees performed maintenance and repairs on the equipment in the Spartanburg plant. None of the Celanese employees performed this type of work. Further, a Celanese employee admitted that Celanese contracted with Daniel because it was "a qualified, capable contractor that can do the expert work that [Celanese] needed done, both in construction and maintenance." (emphasis added). As aptly noted by the circuit court, Appellant "has presented no evidence that its corporate purpose included equipment maintenance."
Moreover, the written contracts between Celanese and Daniel clearly distinguish between the nature of Daniel's work and the nature of the business in which Celanese was engaged, manufacturing polyester fibers. In both the 1972 and 1975 contracts, Section 1, "Scope of Work," states, "The Contractor shall furnish all necessary supervision, labor, equipment, tools, materials, supplies, and incidentals necessary to perform continuous routine maintenance; operation of utility equipment; and emergency, supplementary, or temporary maintenance services as may be required by the Owner."[5] In the 1972 contract, Section 8, "Installed Equipment," states,
Under no circumstances shall Contractor be responsible for operation of Owner's equipment, unless it is expressly agreed in writing that the Contractor shall supervise its personnel in the performance of such services. Equipment installed by the Contractor shall not be operated by the Contractor, unless and until a signed acceptance thereof and release of responsibility for further operation has been furnished to the Contractor. Under no circumstances shall the Contractor be responsible for the actual capacity, productivity, or suitability for its intended use of mechanical, process, or production equipment.
This language also appears in section 8 of the 1975 contract, with the exception of the second sentence. While these contracts provided for Celanese to reimburse Daniel for workers'
**376 compensation premiums, it was Daniel who carried this insurance on its employees.
Based on the foregoing, the preponderance of the evidence supports the circuit court's conclusion that Seay was not a statutory employee of Celanese.
II. Mistrial/Jury Deliberations
Appellant asserts that the circuit court erred by declining to grant a mistrial on the ground of jury misconduct because the jury engaged in premature deliberations and considered outside influences. We disagree.
Following Respondents' presentation of four witnesses, Juror # 16 advised the circuit court that he was concerned about a conflict of interest because he was working at the same plant where Seay had worked and he was performing work that was identical to Seay's work. Juror # 16 explained that he did not realize until after he heard some *194 testimony that Seay had worked at the precise plant at which Juror # 16 was working and that Seay had precisely the same job that Juror # 16 had.[6] Juror # 16 stated that he had asked to speak with the court on the previous day, and the circuit court indicated it had just learned of the request. Juror # 16 also stated that other than responding to a question about where he worked, he did not discuss his concern with the other jurors.
Nonetheless, Appellant sought a mistrial. The circuit court denied the motion, concluding there was no evidence that the jury had been tainted or had engaged in premature deliberations, but the court indicated that Juror # 16 would be excused **377 from further service. Appellant requested further examination of Juror # 16, who then advised the court that he told the other jurors he did the same work that Seay had done and worked at the same plant where Seay worked. He also indicated a second juror "asked something about asbestos" but a third juror stated they should not be discussing that. He then recalled that after his first colloquy with the court, upon his return to the jury room, the other jurors asked him what happened. He merely told them that the court asked him if his place of work and job duties would affect his judgment. After the circuit court excused Juror # 16 from further service, Appellant renewed its motion for a mistrial, which the circuit court denied.
After the trial's conclusion, Appellant challenged the circuit court's denial of the mistrial motion in its motion for a new trial. In its order denying the motion, the circuit court repeated that there was no evidence of premature deliberations or of any outside influences affecting the jury's verdict.
"The granting of a motion for a mistrial is an extreme measure [that] should be taken only when an incident is so grievous that the prejudicial effect can be removed in no other way." Mishoe , 366 S.C. at 202, 621 S.E.2d at 366-67. "The burden is on the moving party to show not only error, but also the resulting prejudice." Id. at 202, 621 S.E.2d at 366. Further, "[t]he granting or denying of a motion for mistrial is within the sound discretion of the [circuit court]. Absent an abuse of discretion, the decision of the [circuit court] will not be overturned on appeal." Id.
Moreover, the circuit court "is in the best position to determine the credibility of the jurors;" therefore, the appellate court grants the circuit court "broad deference on this issue." State v. Harris , 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000). Likewise, "the [circuit] court has broad discretion in assessing allegations of juror misconduct." State v. Aldret , 333 S.C. 307, 313, 509 S.E.2d 811, 814 (1999). "[U]nless the misconduct affects the jury's impartiality, it is not such misconduct as will affect the verdict." Id. (quoting State v. Kelly , 331 S.C. 132, 141, 502 S.E.2d 99, 104 (1998) ). "[A] defendant must demonstrate prejudice from jury misconduct in order to be entitled to a new trial." Id. at 314, 509 S.E.2d at 814.
**378 When an allegation of premature jury deliberations arises during trial, the circuit court
should conduct a hearing to ascertain if, in fact, such premature deliberations occurred, and if the deliberations were prejudicial. If requested by the moving party , the court may voir dire the jurors and, if practicable, 'tailor a cautionary instruction to correct the ascertained damage.' "
Id. at 315, 509 S.E.2d at 815 (emphasis added) (quoting United States v. Resko , 3 F.3d 684, 695 (3d Cir. 1993) ).
*195 As to outside influences, a jury must render a verdict free from them. Harris , 340 S.C. at 63, 530 S.E.2d at 627. "In determining whether outside influences have affected the jury, relevant factors include (1) the number of jurors exposed, (2) the weight of the evidence properly before the jury, and (3) the likelihood that curative measures were effective in reducing the prejudice." Id. "The determination of whether extraneous material received by a juror during the course of the trial is prejudicial is a matter for determination by the [circuit] court." Id.
Here, none of the parties actually mentioned premature deliberations in discussing Appellant's mistrial motion. The circuit court raised the issue sua sponte in addressing the mistrial motion. After granting Appellant's request for further questioning of Juror # 16, the circuit court concluded there were no premature deliberations and noted that one of the jurors was actually enforcing the circuit court's instructions not to discuss the case.
Critically, it was incumbent on Appellant to ask the circuit court to voir dire the remaining jurors on their possible premature deliberations, but Appellant did not do so. We note that in Aldret , the supreme court held the appellant was procedurally barred from raising the issue of premature deliberations on appeal not only due to his failure to raise the issue to the circuit court at the first opportunity to do so, but also due to his failure to ask the circuit court to voir dire the jurors concerning this issue. 333 S.C. at 316, 509 S.E.2d at 815 ("In light of Aldret's delay in seeking relief in this case, however, and his failure to specifically request the trial court to voir dire the jurors concerning the premature deliberations , we affirm his conviction for DUI." (emphasis added) ). Therefore, **379 we affirm the circuit court's finding that there was no evidence of premature deliberations.
Appellant argues that the circumstances of Juror # 16's dismissal, i.e., the remaining jurors seeing him leave the jury room for questioning on two occasions and later learning that he was excused from further service, "created the strong inference for the remaining jurors that [he] must have been dismissed because he had information damaging to Celanese." Appellant also argues these circumstances show that it was prejudiced by outside influences on the jury. We disagree. The possibility that the remaining jurors inferred Juror # 16 had information damaging to Celanese is pure speculation. Appellant failed to seek follow-up questioning of the remaining jurors concerning these circumstances; thus, Appellant has not carried its burden of showing actual prejudice. Therefore, we affirm the circuit court's finding that there was no evidence of any outside influence affecting Appellant's right to a fair trial based on Juror # 16's presence on the jury.
Finally, Appellant maintains that the late disclosure of Juror # 16 concerning his conflict adversely affected its "jury selection rights, which separately demonstrates prejudice." Appellant presents this point in one sentence, neither elaborating nor citing any supporting authority. Therefore, we consider this argument abandoned. See In re McCracken , 346 S.C. 87, 92, 551 S.E.2d 235, 238 (2001), modified on other grounds by Matter of Chapman , 419 S.C. 172, 180 n.6, 796 S.E.2d 843, 847 n.6 (2017) ("A bald assertion, without supporting argument, does not preserve an issue for appeal."); Bryson v. Bryson , 378 S.C. 502, 510, 662 S.E.2d 611, 615 (Ct. App. 2008) ("An issue is deemed abandoned and will not be considered on appeal if the argument is raised in a brief but not supported by authority."). Further, we note that the information given by Juror # 16 during voir dire was enough to place Appellant on notice that this juror had the potential to be sympathetic to Seay. See supra n. 6. At this stage of the litigation, Appellant still had an opportunity to exercise a peremptory strike of this juror. Therefore, this precise argument has no merit.
**380 Based on the foregoing, the circuit court properly denied Appellant's mistrial motion on the ground of Juror # 16's interaction with the remaining jurors.
III. Mistrial/Video
Appellant contends that the circuit court erred by admitting into evidence a video of *196 Seay crying out in pain and declining to grant a mistrial based on the video's presentation. We disagree.
At trial, Seay's daughter, Angie Keene, testified concerning Seay's character, his relationship with her and other family members, and his suffering from mesothelioma. During Keene's testimony, Respondents played a video of Seay while he was in hospice care. The video, which lasts less than one minute, shows Seay lying in a bed and softly crying out, "Help me, Jesus" multiple times. There were no objections prior to, during, or immediately after the video was played for the jury.[7] In fact, after Keene completed her testimony, Respondents presented a video deposition of another witness and presented the testimony of Linda Seay before Appellant finally objected to the video of Seay on the next morning of court proceedings, which actually occurred four calendar days later. Appellant argued the video was "highly improper" and requested a mistrial, which the circuit court denied.
In its new trial motion, Appellant argued the audio accompanying the video was "unauthorized" and prejudicial. In its order denying the motion, the circuit court concluded Appellant waived its argument that it was prejudiced by the video by failing to make a contemporaneous objection. The circuit court also concluded the video did not unduly prejudice Appellant because the jury heard other evidence that Seay "died an agonizingly painful death" and this was an undisputed fact in the case.
**381 Preservation
Respondents argue this issue is unpreserved because Appellant did not make a timely objection to the presentation of the video but waited until the next day of court proceedings (four calendar days later) to object. See State v. Johnson , 363 S.C. 53, 58, 609 S.E.2d 520, 523 (2005) ("To preserve an issue for review there must be a contemporaneous objection that is ruled upon by the trial court."); State v. Lynn , 277 S.C. 222, 226, 284 S.E.2d 786, 789 (1981) (holding that the appellant's failure to contemporaneously object to certain testimony could not be "later bootstrapped by a motion for a mistrial"). Appellant argues its failure to contemporaneously object to the video was due to the confusion surrounding its admission. See supra n. 7. Appellant also argues that its failure to raise a contemporaneous objection should be excused by the inflammatory nature of the video. In support of this argument, Appellant cites the following proposition from Toyota of Florence, Inc. v. Lynch : "[E]ven in the absence of a contemporaneous objection, a new trial motion should be granted in flagrant cases where a vicious, inflammatory argument results in clear prejudice." 314 S.C. 257, 263, 442 S.E.2d 611, 615 (1994).
The Toyota opinion addressed an inflammatory closing argument that included three hand-drawn posters depicting men with Asian features and another poster depicting mushroom cloud explosions in each southeastern state comprising the defendant's business territory. Id. The court explained, "We can hardly conceive of a more outrageous argument than that made here. While we do not condone [the appellant's] failure to make a contemporaneous objection, we find it would be wholly unreasonable for any attorney to anticipate this type of abhorrent conduct." Id.
Even if precedent addressing the misconduct of counsel during a closing argument could be used as comparable authority for granting a mistrial based on inflammatory evidence, the video in the present case does not provoke the kind of outrage expressed in the Toyota opinion. Therefore, we will not excuse Appellant's failure to make a contemporaneous objection to the video. Nonetheless, we address the merits for the benefit of the bench and bar.
**382 Merits
"The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may only disturb *197 a ruling admitting or excluding evidence upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.' " Burke , 421 S.C. at 558, 808 S.E.2d at 628 (quoting Commander , 396 S.C. at 262-63, 721 S.E.2d at 417 ). "Determining whether prejudice exists 'depends on the circumstances[,]' and 'the materiality and prejudicial character of the error must be determined from its relationship to the entire case.' " Id. (quoting Taylor , 333 S.C. at 172, 508 S.E.2d at 876 ). "Prejudice in this context means 'there is a reasonable probability the jury's verdict was influenced by the wrongly admitted or excluded evidence.' " Id. (quoting Vaught , 366 S.C. at 480, 623 S.E.2d at 375 ).
Here, Appellant references the other evidence of Seay's struggles with mesothelioma in support of its argument that the video "served no useful purpose other than to play to the jury's sympathy and passion." However, Appellant never raised this particular ground to the circuit court; rather, Appellant merely asserted that the video was "highly improper." See State v. Geer , 391 S.C. 179, 191, 705 S.E.2d 441, 448 (Ct. App. 2010) ("A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground ." (emphasis added) (quoting State v. Dunbar , 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ) ); Armstrong v. Collins , 366 S.C. 204, 225, 621 S.E.2d 368, 378-79 (Ct. App. 2005) (holding the appellant's argument on appeal was not preserved because he argued a different ground before the circuit court).
Further, the record shows that mesothelioma is a particularly "bad cancer" that "requires a lot of pain medication" and caused Seay to suffer "enormously." Therefore, the video of Seay crying out in pain did not unfairly exceed what was necessary to fully inform the jury of the extent of Seay's pain and suffering, a compensable element of his total damages. See Martin v. Mobley , 253 S.C. 103, 109, 169 S.E.2d 278, 281-82 (1969) ("In personal injury actions[,] great latitude is allowed in the introduction of evidence to aid in determining the extent of the damages; and as a broad general rule[,] any **383 evidence [that] tends to establish the nature, character, and extent of injuries [that] are the natural and proximate consequences of [the] defendant's acts is admissible in such actions, if otherwise competent." (quoting Merrill v. Barton , 250 S.C. 193, 196, 156 S.E.2d 862, 863 (1967) ) ); State v. Gray , 408 S.C. 601, 616, 759 S.E.2d 160, 168 (Ct. App. 2014) ("Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence ...." (quoting State v. Gilchrist , 329 S.C. 621, 630, 496 S.E.2d 424, 429 (Ct. App. 1998) ) ); Johnson v. Horry Cty. Solid Waste Auth. , 389 S.C. 528, 534, 698 S.E.2d 835, 838 (Ct. App. 2010) ("Unfair prejudice means an undue tendency to suggest a decision on an improper basis." (quoting State v. Owens , 346 S.C. 637, 666, 552 S.E.2d 745, 760 (2001) ) ).
Based on the foregoing, the circuit court properly denied Appellant's mistrial motion. See Mishoe , 366 S.C. at 202, 621 S.E.2d at 366-67 ("The granting of a motion for a mistrial is an extreme measure [that] should be taken only when an incident is so grievous that the prejudicial effect can be removed in no other way."); id. at 202, 621 S.E.2d at 366 ("The burden is on the moving party to show not only error, but also the resulting prejudice."); id. ("The granting or denying of a motion for mistrial is within the sound discretion of the [circuit court]. Absent an abuse of discretion, the decision of the [circuit court] will not be overturned on appeal.").
IV. New Trial/Excessive Damages
Appellant maintains that the circuit court should have granted a new trial because the verdict was grossly excessive. We disagree.
"[I]f a verdict is so grossly excessive and shockingly disproportionate that it indicates the jury was motivated by passion, caprice, prejudice, or other consideration not founded on the evidence [,] then it is the duty of the trial court and the appellate court to set aside the verdict absolutely." Caldwell , 306 S.C. at 33, 410 S.E.2d at 25 (emphasis added). The amount of unliquidated damages that "a jury might properly award ... is largely a matter of judgment based upon the facts and circumstances of each case." Watson v. Wilkinson Trucking Co. , 244 S.C. 217, 224, 136 S.E.2d 286, 289 (1964). "In determining *198 **384 the question, the facts must be viewed in the light most favorable to the plaintiff[,] and[ ] where the amount of a verdict bears a reasonable relationship to the character and extent of the injury sustained, it is not excessive." Id. Further, "the jury's determination of damages is entitled to substantial deference[,]" and the circuit court's decision on whether to grant a new trial based on the amount of the verdict "will not be disturbed on appeal unless it clearly appears the exercise of discretion was controlled by a manifest error of law." Welch , 342 S.C. at 303, 536 S.E.2d at 420.
As we previously stated, the jury in the present case awarded $2 million in compensatory damages to Seay's estate for the survival claim; $5 million to Seay's estate for the wrongful death claim; and $5 million to Linda Seay for her loss of consortium claim. The jury also found Celanese was willful, wanton, and reckless and awarded $2 million in punitive damages. In its order addressing Appellant's new trial motion, the circuit court very thoroughly addressed how the $2 million award for the survival claim was supported by the evidence of the many medical procedures Seay had to undergo before and after his diagnosis; the physical and mental suffering he endured; and the evidence of Seay's health, vigor, and active family life before he became ill with mesothelioma. See id. at 303, 536 S.E.2d at 420-21 ("Actual damages in a survival action are awarded for the benefit of the decedent's estate. Appropriate damages in survival actions include those for medical, surgical, and hospital bills, conscious pain, suffering, and mental distress of the deceased." (citation omitted) ).
Likewise, the circuit court detailed how Linda Seay's testimony concerning her 47 years of marriage to her best friend supported the $5 million loss of consortium award and, in combination with the testimony of Seay's daughter, supported the $5 million wrongful death award. See S.C. Code Ann. § 15-75-20 (2005) ("Any person may maintain an action for damages arising from an intentional or tortious violation of the right to the companionship, aid, society[,] and services of his or her spouse."); Welch , 342 S.C. at 304, 536 S.E.2d at 421 ("In a wrongful death case, the issue of damages is not directed toward the value of the human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death. Damages recoverable in a wrongful death action **385 include: (1) pecuniary loss; (2) mental shock and suffering; (3) wounded feelings; (4) grief and sorrow; (5) loss of companionship; and (6) deprivation of the use and comfort of the intestate's society, including the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries." (citations omitted) ).
As to the $2 million punitive damages award, the circuit court examined the many sources of knowledge Celanese had concerning the dangers of working with asbestos and the company's continued use of asbestos insulation, gaskets, and packing for years after learning of these dangers. See Clark v. Cantrell , 339 S.C. 369, 378-79, 529 S.E.2d 528, 533 (2000) ("The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future. Punitive damages also serve to vindicate a private right of the injured party by requiring the wrongdoer to pay money to the injured party." (citation omitted) ). The court also noted the failure to warn contract workers about the danger of asbestos exposure or provide them with any protection or protocols to prevent them from breathing in the dust. The circuit court thoughtfully compared all of these awards with awards in other mesothelioma cases and with the legislative cap on punitive damages and concluded the awards were not excessive. See S.C. Code Ann. § 15-32-530 (Supp. 2018) (providing that with certain exceptions, a punitive damages award "may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto or the sum of five hundred thousand dollars"); e.g., Austin v. Stokes-Craven Holding Corp. , 387 S.C. 22, 54, 691 S.E.2d 135, 152 (2010) (holding that the punitive damages award to the plaintiff in a fraud action was not grossly excessive and was consistent with those of comparable cases); Jenkins v. Few , 391 S.C. 209, 224, 705 S.E.2d 457, 465 (Ct. App. 2010) (holding that the 3.6 to 1 ratio of punitive damages to actual damages awarded was "within the range of comparable cases and those most often upheld by South Carolina courts").
*199 On appeal, Appellant argues the jury was motivated by passion, prejudice, "or other considerations not founded on the evidence, particularly the jury's premature deliberations[,] ...
**386 considerations of outside influences, and the improper video." However, Appellant has failed to make a showing that the circumstances surrounding Juror # 16's dismissal influenced the jury's verdict. See supra section II. Further, the presentation of the video of Seay crying out in pain was necessary to fully inform the jury of the extent of Seay's pain and suffering and was not unfairly prejudicial. See supra section III. Moreover, Appellant admitted before the circuit court that there have been much higher awards in other mesothelioma cases. Finally, the evidence supported the damages awards in this case.
As to compensatory damages, the parties stipulated that Seay's medical expenses were $280,457.91. Additionally, Seay's deposition indicates he had to have fluid drained from his lungs 11 times; he had to endure 3 lung surgeries ; he was unable to have surgery on two broken ribs because doctors were concerned about cutting into him anymore; he was temporarily unable to breathe due to collapsed lungs; the chemotherapy made him sick; he was hospitalized for dehydration 3 times; he was unable to keep food down; he was in constant pain from scar tissue; his sleep was poor because he felt like he was lying on marbles; and the pain medication was ineffective. Seay also described the emotional toll the disease had taken on him. During his first two lung surgeries, biopsies were taken and both were negative for cancer. But after the third surgery, he was told he had "asbestos cancer" and had only 12 to 18 months to live. This "hit [Seay] like a tractor and trailer truck had run over [him] ... [I]t was a terrific blow." When asked what was the hardest part about having mesothelioma, Seay replied, "it is knowing that you're going to leave here, definitely going to leave here, and you know it's going to be soon." Additionally, his wife and daughter testified regarding his relationship with them and other family members and the void left by his death.
As to punitive damages, the record shows that Celanese received from Union Carbide an asbestos toxicology report, dated December 16, 1970, indicating that mesothelioma had been associated with even slight exposure to asbestos.
**387 Additionally, an epidemiological study performed by two physicians in 1930 recommended, inter alia , that workers exposed to asbestos receive not only training and warning about the risk involved but also respirators or respiratory masks, when necessary, to filter out the dust. Yet, Seay was never warned about the danger of asbestos or instructed to wear a respirator or mask, and he never saw any insulation workers wearing this protection.
Further, Respondents make a compelling argument that the evidence shows a "culture of concealment" at Celanese. An internal memorandum for the commercial hazards committee, dated "February, 1963," stressed the "serious legal hazard" in creating written interim reports or correspondence and encouraged (1) keeping such documentation "to a minimum," (2) avoiding "all general correspondence relating to such matters," (3) confining the contents to factual data, and (4) omitting any opinions. Additionally, a May 21, 1979 document, labeled as "Confidential," directed the preparation of a "backup statement" for plant supervisors to use when an employee requested information on "suspect material." The document required the statement to "emphasize that data is inconclusive and will be verified or refuted by further, more refined testing" and to also emphasize "that exposures are being monitored and controlled below appropriate limits."
In sum, the circuit court properly concluded that the damages awards were supported by the evidence and were not excessive.
CONCLUSION
Based on the foregoing, we affirm the circuit court's order denying Appellant's post-trial motions.
AFFIRMED.
LOCKEMY, C.J., and THOMAS, J., concur.

See S.C. Code Ann. § 42-1-540 (2015) ("The rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee ... as against his employer, at common law or otherwise, on account of such injury, loss of service[,] or death.").

See also Raines v. Gould, Inc. , 288 S.C. 541, 547, 343 S.E.2d 655, 659 (Ct. App. 1986) (holding the defendant's "trade or business" did not encompass the plaintiff's installation of an electrical system at a plant being constructed for the defendant because its mere involvement with the construction of numerous facilities on its property was not accompanied by the creation of a construction division or performance of construction work "by its regular employees"); 6 Arthur Larson et al., Larson's Workers' Compensation § 70.06[1] (Matthew Bender Rev. Ed. 2017) (analyzing cases across multiple jurisdictions with statutes comparable to section 42-1-400 and concluding they "agree upon the general rule of thumb that the statute covers all situations in which work is accomplished [that] this employer, or employers in a similar business, would ordinarily do through employees").

Olmstead , 354 S.C. at 426, 581 S.E.2d at 486.

Appellant also assigns error to the circuit court's reliance on opinions addressing statutory employment in the construction setting, namely Glass , 325 S.C. at 202, 482 S.E.2d at 51 (holding the plaintiffs, both welders for a construction contractor in charge of replacing a building's facade, were not statutory employees of the defendant, a manufacturer of a chemical compound used as a mortar additive, because the manufacturer commissioned the construction project merely in settlement of litigation involving the mortar additive, and the construction activity was not a part of the defendant's trade), and Raines , 288 S.C. at 542, 547, 343 S.E.2d at 656, 659 (holding the plaintiff, an employee of a subcontractor commissioned to install an electrical system at a plant "being constructed for [the defendant] by a general contractor" was not the defendant's statutory employee because his work "was not a part of the trade or business of" the defendant, which was "the '[m]anufacturing and selling [of] batteries of all kinds and related products' "). We hold the circuit court properly relied on these opinions because they reinforce the concept that each case must be decided according to its own facts.

Supplies were kept in a storeroom on site.

During voir dire, the circuit court did not mention the precise plant at which Seay had worked or Seay's precise job duties. The circuit court posed the following question during voir dire: "And then there were some other companies who were affiliated with or related to Celanese, and that would be: Hystron, Hystron Fibers, Hoechst, Hoechst Fibers, Hoechst Celanese. Has anyone ever worked for them, or had a member of their immediate family work for them, or have any relationship whatsoever with these companies?" Juror # 16 responded, "I'm working for Auriga Polymers, which used to be called Celanese. I know some people [who] worked for Hoechst Celanese." The circuit court asked Juror #16 and the other prospective jurors responding to the question if there was anything that would keep them from being fair and impartial or if there was any reason why they could not decide the case solely on the evidence and the law, to which there was no response.

Appellant's trial counsel told the circuit court that Respondents' counsel failed to give him advance notice that the video was accompanied by audio and included a reference to Jesus. Appellant's counsel also advised the court that he did not object immediately after the video was played because he "just assumed" the video had been cleared by another member of the defense team and he later learned that the video "was not cleared with anyone."