# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jacque Lucas, Shirley Ann Lucas, and Daniel Simerly, Appellants,

v.

KapStone Paper and Packaging Corporation, KapStone Kraft Paper Corporation, Safway Group Holdings, LLC, Easy Way Insulation Co., Sypris Technologies, Inc. f/k/a Tube-Turns Technologies Inc., Thompson Construction Group, Inc., and Thompson Industrial Services, LLC, Defendants,

of which KapStone Paper and Packaging Corporation and KapStone Kraft Paper Corporation are the Respondents.

Appellate Case No. 2020-001210

———

Appeal from Charleston County
Jennifer B. McCoy, Circuit Court Judge

———

Opinion No. 6036
Heard October 11, 2023 – Filed November 15, 2023

———

**AFFIRMED**

———

Badge Humphries, of Griffin Humphries LLC, of Sullivan's Island, and Russell S. Post, of Houston, Texas, for Appellants.

Richard Hood Willis and Brian Hollis Gibbs, both of Williams Mullen, of Columbia, for Respondents.

———

**GEATHERS, J.:** Appellants—Jacque Lucas, Shirley Ann Lucas, and Daniel Simerly—challenge the circuit court's order dismissing this personal injury action as to Respondents, KapStone Paper and Packaging Corporation (Paper) and KapStone Kraft Paper Corporation (Kraft), for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), SCRCP. Appellants argue the circuit court erred by concluding that Respondents were alter egos of KapStone Charleston Kraft, LLC (Employer) for purposes of the exclusivity provision of the South Carolina Workers' Compensation Law,[1] section 42-1-540 of the South Carolina Code (2015).[2] We affirm.

## FACTS/PROCEDURAL HISTORY

On May 24, 2016, Jacque Lucas and Daniel Simerly (collectively, Employees) were involved in a horrific accident at their workplace in North Charleston, a paper mill owned by Employer. While Employees were clearing and cleaning a large overhead vessel used to hold hot chemicals, they opened a door at the bottom of the vessel, and a buildup in the vessel caused hot "black liquor" to rush out and spray them, resulting in severe burns across their bodies.[3] They received extensive treatment at the Augusta Burn Center, including skin grafts and psychological counseling.

---

[1] Section 42-1-10 of the South Carolina Code (2015) states, "This title shall be known and cited as 'The South Carolina Workers' Compensation Law[.']"

[2] Section 42-1-540 provides, in pertinent part,

> The rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin *as against his employer*, at common law or otherwise, on account of such injury, loss of service or death.

(emphasis added).

[3] Lucas sustained burns across sixty-six percent of his body, and Simerly sustained burns across ten percent of his body.

On February 17, 2017, Appellants filed this personal injury action against Paper, the parent corporation of Employer's sole member (Kraft),[4] and other defendants not involved in this appeal.[5] In their First Amended Complaint, Appellants added Employer's sole member, Kraft,[6] as a defendant and asserted causes of action for "Negligence, Gross Negligence and Recklessness" and Loss of Consortium. According to paragraph 20 of the First Amended Complaint, Paper and Kraft provided "consulting and other services to [Employer] to develop, supervise[,] and implement safety procedures and comply with applicable regulations [or] standards at the subject facility[] as well as authorize certain capital projects at the facility." Paragraph 21 states that Paper and Kraft "had a duty to[,] but failed to[,] identify the dangers inherent in the process of cleaning the vessel and failed to recommend measures to avoid the injuries suffered by [Employees]." Paragraph 25 lists several duties attributed to Paper and Kraft, including adequately training their "employees, agents [or] contractors," "timely and adequately remedy[ing] a known hazard," "provid[ing] a safe working environment," and timely approving "necessary capital projects."

Subsequently, Respondents filed a motion to dismiss this action pursuant to Rule 12(b)(6), SCRCP, on the ground that they both "qualif[ied] as statutory employers because they operate[d] for all practical purposes as one integrated entity," citing to *Poch v. Bayshore Concrete Products/South Carolina, Inc.*, 405 S.C. 359, 372–73, 747 S.E.2d 757, 764 (2013), and therefore, they were immune from suit pursuant to the South Carolina Workers' Compensation Law. They later amended the motion on two occasions and indicated that their motion was based on Rule 12(b)(1), SCRCP, rather than Rule 12(b)(6). Respondents also indicated that they were seeking dismissal as to themselves only. According to Respondents, in November 2018, while their motion to dismiss was pending, WestRock purchased Paper and all of its subsidiaries. Those subsidiaries included Employer and Kraft.

In February 2020, the circuit court granted Respondents' motion to dismiss, concluding that Employer and Respondents were economically integrated pursuant to the factors set forth in *Poch*. The circuit court later denied Appellants' Rule 59(e), SCRCP, motion. This appeal followed.

---

[4] Employer is a limited liability company.

[5] Appellants' Complaint and First Amended Complaint include two products-liability claims.

[6] Appellants substituted Kraft for KapStone Container Corporation, which was listed as a defendant in the original Complaint and dropped from the First Amended Complaint.

## ISSUES ON APPEAL

I.   Did the circuit court misapply the "alter ego" factors set forth in *Poch* by treating Paper and Kraft as one?

II.  Were Paper and Employer separate and distinct corporate entities rather than alter egos under the *Poch* factors?

III. Were Kraft and Employer separate and distinct corporate entities rather than alter egos under the *Poch* factors?

## STANDARD OF REVIEW

Generally, "[w]hether subject matter jurisdiction exists is a question of law, which th[e appellate c]ourt is free to decide with no particular deference to the circuit court." *S.C. Pub. Int. Found. v. Wilson*, 437 S.C. 334, 340, 878 S.E.2d 891, 894 (2022). "[D]etermination of the employer-employee relationship for workers' compensation purposes is jurisdictional. Consequently, this [c]ourt has the power and duty to review the entire record and decide the jurisdictional facts in accord with the preponderance of the evidence." *Keene v. CNA Holdings, LLC*, 426 S.C. 357, 365, 827 S.E.2d 183, 188 (Ct. App. 2019) (alterations in original) (quoting *Poch*, 405 S.C. at 367, 747 S.E.2d at 761), *aff'd*, 436 S.C. 1, 870 S.E.2d 156 (2021).

## LAW/ANALYSIS

Appellants argue that both Respondents were separate and distinct from Employer rather than alter egos of Employer, and thus, they were not immune from this lawsuit for purposes of section 42-1-540. We disagree.

## I.   Background

"A parent corporation is generally not immune from an action in tort by an injured employee of its subsidiary by virtue of the employee's entitlement to workers' compensation." *Poch*, 405 S.C. at 370, 747 S.E.2d at 763 (quoting 82 Am. Jur. 2d *Workers' Compensation* § 90 (2003)).

> Where an employee of a subsidiary is injured while working on property owned by the parent corporation and receives workers' compensation benefits from the

> subsidiary, the employee may maintain an action in tort against the parent corporation even though parent and subsidiary are covered by same policy of workers' compensation insurance.
>
> However, a parent corporation's immunity has been recognized in some instances on the theory that the parent is or may be found to be the alter ego of the employer-subsidiary corporation.

*Id.* at 370–71, 747 S.E.2d at 763 (quoting 82 Am. Jur. 2d *Workers' Compensation* § 90 (2003)).  In *Poch*, our supreme court applied the factors set forth in *Monroe v. Monsanto Company*, 531 F. Supp. 426 (D.S.C. 1982), "that courts should consider in determining whether two related businesses are separate and distinct corporations for workers' compensation purposes."  405 S.C. at 371–74, 747 S.E.2d at 763–65. The court stated,

> These factors may be assessed by answering the following questions:
>
> (1) Did the two businesses maintain separate corporate identities?
>
> (2) Did the two businesses maintain separate Boards of Directors?
>
> (3) Did the two businesses transact business from different locations under different managers?
>
> (4) Did the two businesses hire and pay their own employees?
>
> (5) Did the two corporations hold themselves out to their employees as two separate identities?
>
> (6) Did the two corporations engage in different business activities?
>
> (7) Did the two corporations maintain separate books, bank accounts, and payroll records?

(8) Did the two corporations file separate tax returns?

*Id.* at 372, 747 S.E.2d at 764 (citing *Monroe*, 531 F. Supp. at 434). The court also noted that there may be additional relevant factors in any given case and no one factor by itself provides immunity. *Id.* at 373, 747 S.E.2d at 764. After applying these eight factors to compare the claimant's statutory employer with its parent corporation, the court found the preponderance of the evidence showed the two corporations "operated as one economic entity." *Id.* at 374, 747 S.E.2d at 765.

In the present case, during oral argument, Appellants urged us to apply the *Poch* factors narrowly because (1) the alter-ego analysis is merely one means of piercing the corporate veil, and our courts have discouraged veil piercing;[7] and (2) the general rule is that a subsidiary's employee may maintain an action in tort against the parent corporation and the alter-ego theory is an exception to that rule. Appellants argue this places the burden on Respondents to show they have a genuine economic identity with Employer. Appellants further argue that Respondents have shown merely the kind of identity that exists in every "common multi-entity corporate structure" designating a holding company as the parent entity providing shared financial and operational services and oversight to the operations of its subsidiaries. Appellants ask us to draw a "principled line" to avoid "collapsing" all of these common structures into alter egos and, thus, inverting the general rule (that a claimant may sue a parent corporation) and the rule's exception.

To illustrate their point, Appellants cite to Respondents' One KapStone project, which we address in more detail below, as "the most compelling evidence that supports reversal" of the circuit court's order. However, *Poch* reminds us that "no one factor is controlling." 405 S.C. at 373, 747 S.E.2d at 764. Further, we view the determination of whether two corporations truly operate as one economic entity

---

[7] *See Drury Dev. Corp. v. Found. Ins. Co.*, 380 S.C. 97, 101 n.1, 668 S.E.2d 798, 800 n.1 (2008) ("Although often used interchangeably, the terms 'alter ego' and 'piercing the corporate veil' are not one and the same. Whereas 'alter ego' describes a theory of procedural relief, 'piercing the corporate veil' refers to the relief itself. In other words, '[t]he alter ego doctrine is merely a means of piercing the corporate veil.'" (citation omitted) (quoting 18 C.J.S. *Corporations* § 23 (2008))); *see also Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1344 (4th Cir. 1992) ("[A] piercing of the corporate veil generally will not be permitted for the benefit of the parent corporation or its stockholders."); *id.* ("[A] sole shareholder may not choose to ignore the corporate entity when it is convenient.").

(and are, therefore, alter egos) as already built into the *Poch* factors such that our duty is to simply weigh the evidence relevant to those factors in an unbiased manner. *See Keene*, 426 S.C. at 365, 827 S.E.2d at 188 ("[D]etermination of the employer-employee relationship for workers' compensation purposes is jurisdictional. Consequently, this [c]ourt has the power and duty to review the entire record and decide the jurisdictional facts in accord with the preponderance of the evidence." (quoting *Poch*, 405 S.C. at 367, 747 S.E.2d at 761)). We may not stray from that duty unless and until our supreme court draws a new principled line as Appellants have asked us to do. If the preponderance of the evidence as to the *Poch* factors shows that two corporations operated as one economic unit, we must treat them as alter egos no matter how "common" Appellants view such a relationship.

Appellants also urge us to avoid applying the rule that all doubts are resolved in favor of workers' compensation coverage to a *Poch* alter-ego analysis.[8] Again, we view our duty as that of simply deciding the facts pertaining to the *Poch* factors in accordance with the preponderance of the evidence, and we remain mindful that "no one factor is controlling." *Poch*, 405 S.C. at 373, 747 S.E.2d at 764; *see Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 300–01, 676 S.E.2d 700, 702 (2009) ("This Court remains sensitive to the general principle sanctioned by the Legislature that workers' compensation laws are to be construed liberally in favor of coverage. That principle, however, does not go so far as to justify an analytical framework that preordains the result.").

## II. Combined Analysis

Appellants' first assignment of error is to the circuit court's examination of the corporate relationships of all three entities collectively. Appellants maintain that the circuit court should have bifurcated the analysis. We have not found any precedent explicitly rejecting a joint analysis of the relationships between a claimant's employer and two related corporations. However, the language in *Poch* addresses a comparison of the employer with just one other business entity. 405 S.C. at 372, 747 S.E.2d at 764 ("[*Monroe*] analyzed South Carolina law and gleaned eight factors

---

[8] *See Posey v. Proper Mold & Eng'g, Inc.*, 378 S.C. 210, 217, 661 S.E.2d 395, 399 (Ct. App. 2008) ("It is the policy of South Carolina courts to resolve jurisdictional doubts in favor of the inclusion of employers and employees under the Workers' Compensation Act."); *see also Poch*, 405 S.C. at 367, 747 S.E.2d at 761 ("Any doubts as to a worker's status should be resolved in favor of including him or her under the [South Carolina Workers' Compensation Law]." (quoting *Posey*, 378 S.C. at 218–19, 661 S.E.2d at 400)).

that courts should consider in determining whether *two related businesses* are separate and distinct corporations for workers' compensation purposes." (emphasis added)); *id.* ("These factors may be assessed by answering the following questions: (1) Did the *two* businesses maintain separate corporate identities? . . . ?" (emphasis added)). Therefore, out of an abundance of caution, we will bifurcate our analysis.

### III. Paper/Employer

Before we compare Employer with Paper, we emphasize that we are considering only the evidence relevant to May 24, 2016—the date of the accident.[9]

### 1. Did the two businesses maintain separate corporate identities?

No. Paper, which is headquartered in Northbrook, Illinois, provided the following history in its 2016 annual report to the United States Securities and Exchange Commission (SEC) (Form 10-K):

> KapStone Paper and Packaging Corporation was formed in Delaware as a special purpose acquisition corporation on April 15, 2005 for the purpose of effecting a merger, capital stock exchange, asset acquisition or other similar business combination with an unidentified operating business in the paper, packaging, forest products, and related industries.[10] Unless the context otherwise

---

[9] The parties occasionally cite to affidavits and reports prepared by their respective financial analysts for the purpose of giving an opinion on whether Paper or Kraft operated with Employer as one economic entity. To the extent these documents provide opinions, we disregard them because *Poch* clearly requires this court to conduct its own legal analysis comparing the claimant's employer with the defendant-entities based on the court's own view of the preponderance of the evidence relating to the *Poch* factors. However, we will consider any raw data pulled from corporate records that appear in these documents when the data does not appear elsewhere in the record and its veracity has not been challenged.

[10] A special purpose acquisition company is defined as "a corporate shell . . . set up by investors for the sole purpose of raising money through an initial public offering to acquire another business yet to be determined." Special Purpose Acquisition Company, Merriam-Webster, https://www.merriam-webster.com/dictionary/special%20purpose%20acquisition%20company (last visited Nov. 13, 2023). A shell corporation is defined as "[a] corporation that has

requires, references to "KapStone," the "Company," "we," "us[,]" and "our" refer to KapStone Paper and Packaging Corporation and its subsidiaries.

Paper also described (1) its acquisition of "substantially all of the assets" of two businesses operating kraft paper manufacturing facilities in Roanoke Rapids, North Carolina and North Charleston, South Carolina, respectively; (2) its merger with a company that owned a recycled containerboard paper mill in Cowpens, South Carolina; and (3) its acquisition of other businesses owning similar facilities.

In that same report, Paper stated,

> We report our operating results in two reportable segments: Paper and Packaging and Distribution. Our Paper and Packaging segment manufactures and sells a wide variety of containerboard, corrugated products and specialty paper for industrial and consumer markets. The Distribution segment, through [Victory Packaging, L.P. and its subsidiaries ("Victory")], a North American distributor of packaging materials, with more than 60 distribution centers located in the United States, Mexico and Canada, provides packaging materials and related products to a wide variety of customers.

Paper further stated, "Our Paper and Packaging segment competes in the containerboard, corrugated products[,] and specialty paper markets. We view the specialty paper market as including kraft paper, saturating kraft[,] and unbleached folding carton board." Moreover, Paper reported that it operated four paper mills, including Employer's facility in North Charleston and Kraft's facility in Roanoke Rapids, North Carolina. The Form 10-K also included a table summarizing Paper's paper mills and the "principal products produced" at each. It listed "North Charleston, SC" as producing "Containerboard/Specialty Paper" and "Roanoke Rapids, NC" as producing "Containerboard/Specialty Paper."

All of these representations to the SEC are credible evidence of Paper's purpose to serve as the foundation and support for a nationwide network of specialty

---

no active business and usu[ally] exists only in name as a vehicle for another company's business operations." *Corporation*, Black's Law Dictionary (11th ed. 2019).

paper manufacturing and distribution, and this purpose aligned with Employer's role in the network. The testimony of Paper's Corporate Controller, Mark Niehus, is consistent with this. He stated that Paper had "a centralized group on behalf of our entire mill system" and Paper had four different paper mills; the centralized group determined which location would fulfill a particular purchase order based on various factors.

Correspondence and employment-related documents also show a shared identity between Paper and Employer. They both used the registered "KapStone" trademark and "K-Box" logo,[11] which can be seen on Employer's letterhead and Paper's employment-related documents, such as the benefits brochure, job descriptions, employment applications, and offer letters. Further, specified work locations set forth in Paper's job-description documents included Employer's facility. Moreover, the 2016 W-2 form for Lucas listed Employer's name and tax identification number but associated Employer's name with Paper's address in Northbrook, Illinois. Additionally, Paper adopted numerous written policies applicable to all of the company's mills, including Employer.

Paper's Director of Treasury and Risk, Kelly Hulseman,[12] stated in her affidavit that Paper collected receivables from Employer and Kraft, and they were "ultimately swept into bank accounts in the name of [Paper]." She stated that Paper "use[d] the receivables it collect[ed] to pay for expenses for [Employer] and [Kraft], including payroll, employee benefits[,] and all accounts payable" as neither Employer nor Kraft kept cash, except for the limited purpose of international transactions. Rather, these two entities had zero-balance bank accounts for collecting revenues and then directing those funds to Paper's Master Account at the end of each day.

Finally, Paper's workers' compensation insurance policy also covered Employer and Kraft.

## 2. Did the two businesses maintain separate Boards of Directors?

No. Employer was a limited liability company and therefore did not have a board. However, Employer's sole managing member, Kraft, had two directors who were also members of Paper's Board. The three entities also shared common Chief Executive Officers (CEOs), Chief Financial Officers (CFOs), Chief Operating

---

[11] Kraft owned the trademark.

[12] In 2017, her title changed to Vice President of Shared Services.

Officers (COOs), and Secretaries. According to Mark Niehus, Paper's Corporate Controller, board meetings for all of Paper's subsidiaries were conducted at the Northbrook, Illinois headquarters.[13]

**3.      Did the two businesses transact business from different locations under different managers?**

They had different locations but overlapping management. Paper's headquarters was in Northbrook, and Employer's facility was in North Charleston.[14] Kelly Hulseman confirmed that none of the employees performing the manufacturing work itself were located at headquarters. Yet, despite their separate locations, Paper entered into third-party contracts to supply raw materials to, and lease equipment for, Employer's facility. Paper's Director of Strategic Sourcing signed these contracts on behalf of Paper. We acknowledge that some equipment leases were executed by Employer as the lessee, but the individual who signed on behalf of Employer was Paper's Director of Strategic Sourcing.

Further, Paper employees determined which location should fulfill a particular purchase order based on various factors and processed the cash receipts of the various subsidiaries. Moreover, a single legal department and other common managerial departments, such as the accounting department, were based at the corporate headquarters in Northbrook, Illinois—Hulseman testified that all three entities' locations were on the same accounting system. She also testified that before January 2017, there was no formal "Shared Services Department," but "the functions were the same before and after [her] title changed." The duties of her position included accounts receivable, accounts payable, credit collections, insurance, and payroll, and she dealt with these areas "for the whole company[,] which include[d] [Employer]." She knew exactly what was going on at every plant, including

---

[13] Appellants argue that a document listing the board members and officers is unverified and lacks credibility. They also assert that the document shows the companies' officers for the year after the accident. However, the document on pages 1702-03 of the record indicates the officers "[a]s of 02/23/2016," which was before the May 24, 2016 accident. Therefore, Appellants must be referring to a different document referenced in another part of the record. Nevertheless, the document on pages 1702-03 is also unverified as it does not bear the KapStone trademark or other indicia that it was officially adopted by Paper. However, its content can be verified by consistent information in Paper's written policy specifying individuals who were authorized to sign contracts on behalf of Paper or its subsidiaries.

[14] Employer owned the Charleston facility.

Employer's facility, as to the areas she dealt with, and she dealt with the day-to-day operations at Employer's facility as to those areas.

Additionally, three invoices from a third party relating to certain equipment listed the asset location as Employer's facility, yet, at the top, the invoices set forth Paper's address in Northbrook. Also, the checks written to pay these invoices were written by Paper. A fourth invoice from the same business was for KapStone Container Corporation, associated with Paper's Northbrook address, but showed the asset location as Employer's facility.

The above arrangements are similar to the arrangements of the parent corporation in *Poch*:

> As to the third factor, Bayshore Corp. was headquartered in Virginia whereas Bayshore SC operated exclusively in South Carolina. However, Bayshore Corp. entered into the lease agreement in South Carolina, purchased the equipment to be used on the jobsite, and periodically sent several Bayshore Corp. employees to oversee the completion of the project. Significantly, all of the billing invoices and normal correspondence for Bayshore SC were sent to Bayshore Corp. in Cape Charles, Virginia. Bayshore Corp. also retained all of Bayshore SC's corporate and personnel files.

405 S.C. at 373, 747 S.E.2d at 764.

**4.     Did the two businesses hire and pay their own employees?**

Generally, Paper and Employer hired their own respective employees, but some of Paper's employees worked at Employer's facility, and Kelly Hulseman (a Paper employee) supervised the time and attendance analyst who worked at Employer's location. Also, the employment application bore Paper's name and the KapStone trademark and logo, and it required the applicant to authorize a background check by Paper.

Payment of Employer's employees was a joint arrangement between Paper and Employer. Employees for each respective entity received a paycheck bearing the names of their respective employers, but with the Northbrook address. Paper managed payroll for all of its subsidiaries' employees through its payroll services

department and ADP, a third-party processor. Also, the 2016 W-2 forms and the earnings statements for Lucas and Simerly associated Employer's name with Paper's address in Northbrook. Further, Paper kept track of the various "pay groups" and payroll frequency for its subsidiaries, including Employer.

**5.      Did the two corporations hold themselves out to their employees as two separate identities?**

Generally, no. The respective offer letters to Lucas and Simerly had a return address for Employer, but the stationery was marked with the KapStone logo, which was also used by Paper and was owned by Kraft. Further, as part of their respective employment applications, Employees signed a form giving their consent for *Paper* to request investigative consumer reports from a consumer reporting agency. Other employment-related documents used by Employer bore the KapStone trademark and logo, and some of them clearly addressed employees of all of Paper's subsidiaries. Additionally, Employer's employees were required to sign an acknowledgement that they had received and read Paper's ethics code, and the introduction to the written policy represented Paper as the employer.

Collective bargaining agreements with labor unions were specific to certain facilities in varying locations. Yet, Paper provided the fringe benefits to Employer's employees, and both Employer and Kraft participated in Paper's 401(k) and Deferred compensation plans.

**6.      Did the two corporations engage in different business activities?**

Yes and no. On its 2016 federal tax return, Paper indicated that its principal business activity was serving as a holding company. Further, Kelly Hulseman acknowledged that Paper did not manufacture or sell paper products itself. Employer manufactured the packaging and paper products at the North Charleston plant, and some of Paper's internal communications indicate that Employer operated with a significant level of independence. Yet, as indicated above, Paper was intimately involved with directing order fulfillment, arranging for the supply of raw materials and equipment for Employer, providing general guidelines for operations,[15] and

---

[15] As previously stated, Paper adopted numerous written policies applicable to all of the company's mills, which included Employer. These policies included, inter alia, requirements to count raw materials and finished goods annually and to establish a written procedure for taking annual inventories or monthly cycle counts. Further, Paper's Form 10-K indicated that productivity at its mills was monitored by

providing virtually all other support services, such as payroll, employee benefits, insurance, and receivables.[16]

**7.     Did the two corporations maintain separate books, bank accounts, and payroll records?**

Generally, no.   A Paper employee, Kelly Hulseman, managed accounts receivable, accounts payable, credit collections, insurance, and payroll for Paper and all of its subsidiaries, including Employer.  Hulseman testified that the accounting department for Paper and all subsidiaries was in Northbrook and was run by the Corporate Controller, Mark Niehus.  All locations were on the same accounting system, and the accounting department prepared consolidated financial statements. However, it was possible to prepare a combined balance sheet and income statement showing separate data for the three entities.  Also, as previously indicated, Paper had a "Master" bank account into which the subsidiaries' respective bank accounts would deposit revenues on a daily basis.

**8.     Did the two corporations file separate tax returns?**

No.  In its 2016 federal tax return, Paper completed the box for "Name of corporation," with "KapStone Paper & Packaging Corporation *& Subs*." (emphasis added).   The return's "Affiliations Schedule" does not list Employer; however, Employer's sole member, Kraft, is listed.  The omission of Employer's name from the tax return may be explained by the treatment required by the IRS:

> Depending on elections made by the LLC and the number of members, the IRS will treat an LLC either as a corporation, partnership, or as part of the owner's tax return (a "disregarded entity").  . . . For income tax purposes, an LLC with only one member is treated as an entity disregarded as separate from its owner, unless it

---

management "on a real-time basis with on-line reporting tools that track[ed] production values," and equipment efficiency was "also monitored daily through production reporting systems."

[16] Appellants argue that the court should give significant weight to the fact that Paper forfeited its authority to do business in South Carolina as of June 2015 by failing to timely file an annual report with the Department of Revenue and failing to timely pay taxes.  Although these facts are worthy of consideration, they do not outweigh the evidence of Paper's actual involvement in Employer's business.

files Form 8832 and affirmatively elects to be treated as a corporation.

*Single Member Limited Liability Companies*, Internal Revenue Serv., https://www.irs.gov/businesses/small-businesses-self-employed/single-member-limited-liability-companies (last visited Nov. 13, 2023). Specifically, "[i]f the single-member LLC is owned by a corporation or partnership, the LLC should be reflected on its owner's federal tax return as a division of the corporation or partnership." *Id.* Yet, the "owner" of Employer was Kraft, who did not file its own tax return. Further, Appellants have not directed the court to anything in the record resembling a separate tax return for Employer.

### 9. Other factors

Appellants contend the purpose of the One KapStone project, which Paper initiated in late 2016, was "to *correct* the *lack* of operational integration among its subsidiaries that existed before January 2017." (emphases in original). Characterizing the project as "post-accident integration efforts," Appellants assert that the project "highlight[ed] the separateness of its subsidiaries' operations at the time of the accident."

The One KapStone project was initiated to remedy a $150 million earnings "gap" compared to Paper's peers by addressing inconsistencies between the respective operations of Paper's Mill Division and its Container Division. Paper's consultant, Deloitte Development, LLC, conducted meetings for the project's leadership team to discuss steps for integrating the mill and container systems and saving costs. Rather than signaling any transition from separate economic entities to one economic entity, much of the communications regarding the One KapStone project emphasized a desire to standardize operational procedures across the mill and container divisions.[17] These communications show that Paper and its subsidiaries were already economically integrated, yet the company sought to improve the efficiency of its operations, including adding facilities to convert paper into corrugated products. We agree with the circuit court's conclusion that "the fact

---

[17] Some of the One KapStone documents on which Appellants rely specify certain "integration" goals or objectives that seem inconsistent with the abundance of other evidence objectively indicating that Paper and its subsidiaries operated as one economic entity, such as Paper's 2016 Form 10-K, its 2016 consolidated federal tax return, its financial and employment documents, and its policy documents. The circuit court noticed this same dichotomy.

that [Paper] could implement a 'One KapStone' program to make its subsidiaries' operations more consistent demonstrates [Paper's] overarching control over its subsidiaries' business operations."

In sum, considering the preponderance of the evidence pertaining to the *Poch* factors, Paper and Employer operated as one economic entity, and therefore, Paper was Employer's alter ego.

## IV.    Kraft/Employer

### 1.    Did the two businesses maintain separate corporate identities?

Generally, no. Kraft was the sole member of Employer, a limited liability company. The history of the two entities suggests a shared identity, yet they were associated with two separate mills—Kraft owned the mill in Roanoke Rapids, North Carolina, and Employer owned the North Charleston mill.

Employer came into existence when Kraft entered into a Limited Liability Company Agreement with Employer as Employer's sole member.[18] The agreement required Kraft to manage Employer and gave Kraft authority to act on behalf of Employer and to appoint Employer's officers. Moreover, decisions concerning Employer's business affairs were to be made by Kraft, and Kraft's actions were binding on Employer.

On the other hand, Kraft could not be obligated personally for any liability solely by reason of being a member or acting as a manager or officer of Employer. Also, the agreement allowed Employer to maintain liability insurance at its own expense. Employer's books and accounts were to be kept by Kraft but located at Employer's principal office, and this location was to be determined by Kraft. Employer's funds were to be deposited in its name in an account with a bank designated by Kraft. Additionally, Employer had its own labor contracts.

However, Kraft owned the registered "KapStone" trademark and "K-Box" logo that was used on all employment-related documents and the shared KapStone website. Also, the offer letter to Lucas signaled that Employer was part of Kraft.

### 2.    Did the two businesses maintain separate Boards of Directors?

---

[18] At the time, Employer was named "Oak Acquisition, LLC."

No.  As we previously stated, Employer was a limited liability company and, therefore, did not have a board.  Rather, Kraft was Employer's sole managing member, having direct managerial power over Employer.  Further, Kraft had two directors who were also members of Paper's Board.  Moreover, the three entities also shared common CEOs, CFOs, COOs, and Secretaries.  According to Mark Niehus, Paper's Corporate Controller, board meetings for all of Paper's subsidiaries were conducted at the Northbrook, Illinois headquarters.

**3.     Did the two businesses transact business from different locations under different managers?**

Yes as to different locations, but with the same management.  As we previously stated, Kraft owned the mill in Roanoke Rapids, North Carolina, and Employer owned the North Charleston mill.  Yet, their limited liability company agreement gave Kraft, Employer's sole member, managerial authority over Employer.  Further, several, but not all,[19] equipment leases in effect on the date of the accident were executed by Kraft for Employer's mill.  Moreover, the president of Kraft, along with other Paper employees, signed the "location approvals" for at least one capital funding request to lease equipment for Employer's mill.

**4.     Did the two businesses hire and pay their own employees?**

Generally, yes.  Kraft and Employer hired their own employees.  However, approximately thirty-five Kraft employees with duties in management or information technology worked at Employer's facility.  Employees for each respective entity received a paycheck bearing the name of their respective employers, but with Paper's Northbrook address.  Further, Paper managed payroll for all of its subsidiaries' employees through its payroll services department and ADP, a third-party payment processor.

**5.     Did the two corporations hold themselves out to their employees as two separate identities?**

Yes and no.  Employer had its own labor contracts.  However, as we previously stated, the offer letter to Lucas signaled that Employer was part of Kraft.  Further, the identities of both Employer and Kraft were integrated with Paper's identity as shown by numerous employment-related documents and fringe benefits.

---

[19] At least one equipment lease was executed by Employer for itself.  Nonetheless, the individual signing on behalf of Employer was a Paper employee.

**6.     Did the two corporations engage in different business activities?**

No.  Employer and Kraft had the same principal business activity.

**7.     Did the two corporations maintain separate books, bank accounts, and payroll records?**

Generally, no.   A Paper employee, Kelly Hulseman, managed accounts receivable, accounts payable, credit collections, insurance, and payroll for all of Paper's subsidiaries, including Employer and Kraft.   Further, the accounting department for all subsidiaries was in Northbrook and was run by Paper's Corporate Controller, Mark Niehus.  All locations were on the same accounting system, and the accounting department prepared consolidated financial statements.  However, it was possible to prepare a combined balance sheet and income statement showing separate data for the three entities.  Also, Paper had a "Master" bank account into which the subsidiaries' respective bank accounts would deposit revenues on a daily basis.

**8.     Did the two corporations file separate tax returns?**

Although Kraft and Employer had separate tax identification numbers, they did not file separate tax returns.

In sum, considering the preponderance of the evidence pertaining to the *Poch* factors, Kraft and Employer operated as one economic entity, and therefore, Kraft was Employer's alter ego.

**CONCLUSION**

Accordingly, the circuit court's order is

**AFFIRMED.**

**THOMAS and KONDUROS, JJ., concur.**